RENA SOBOL ACKERMAN ET AL. *v.* SOBOL FAMILY PARTNERSHIP, LLP, ET AL.

ALFRED CASELLA ET AL. *v.* RUTH SOBOL ET AL.

TAMAR ACKERMAN ET AL. *v.* BANK OF AMERICA ET AL.

IN RE RENA SOBOL ACKERMAN TRUST

TZVI RAKOSZYNSKI ET AL *v.* BANK OF AMERICA ET AL.
(SC 18288)
(SC 18289)

Norcott, Katz, Vertefeuille, Zarella and McLachlan, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued February 17—officially released September 28, 2010

*Wesley W. Horton* and *William P. Horan*, with whom were *Kimberly A. Knox* and, on the brief, *Austin J. McGuigan, Anne C. Dranginis*, and *Alexandra M. Greene*, certified legal intern, for the appellants (plaintiffs).

*Sheila A. Huddleston*, with whom were *Robert L. Wyld* and *Karen T. Staib*, and, on the brief, *Steven D. Ecker* and *Dina S. Fisher*, for the appellees (defendants).

*Opinion*

ZARELLA, J. The principal issue in this consolidated appeal,[1] which arises out of a series of disputes[2] con-

---

[1] The plaintiffs appealed from the judgments of the trial court to the Appellate Court, which consolidated them for review, and we transferred the consolidated appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] The dispute originated with the filing of a complaint by Rena Sobol Ackerman against the Sobol Family Partnership, LLP, Ephraim Sobol, Sobol Property Management, LLC, and Ruth Sobol in June, 2003, and·ultimately

cerning the management and oversight of a family partnership and various family trusts,[3] is whether the plaintiffs' attorney had apparent authority to make settlement proposals, engage in settlement discussions and bind the plaintiffs to a global settlement agreement with the defendants.[4] The plaintiffs claim that the trial court's enforcement of a settlement agreement between the parties, based on a finding of apparent authority on the part of the plaintiffs' attorney to bind the plaintiffs to the agreement, was clearly erroneous in the absence of conduct by the plaintiffs (1) manifesting that their attorney had authority to settle the pending litigation, and (2) leading the opposing defense attorneys reasonably to believe that the plaintiffs' attorney had full and final authority to settle the litigation, as distinguished from authority only to negotiate. The plaintiffs also claim that they were denied their right to a jury trial on issues of fact under article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, when the trial court, in the midst of voir dire, made findings of fact and determined that the litigants had reached a settlement of the pending litigation. The defendants respond that the trial court's finding that the plaintiffs' counsel had apparent authority to settle the litigation was not clearly erroneous and that the plaintiffs had no right to a jury trial on their equitable motions seeking to enforce the agreement. We affirm the judgment of the trial court.

involved five separate cases involving various family members and family partnerships.

[3] The plaintiffs are Rena Sobol Ackerman, individually and as cotrustee of the Rena Sobol Ackerman Trust, Tamar Ackerman, Sara Ackerman, Jason Ackerman, Tzvi Rakoszynski, Mical Sobol Mann and Alfred Casella, as cotrustee of the Rene Sobol Ackerman Trust, hereinafter referred to collectively as the plaintiffs unless otherwise noted.

[4] The defendants are Ruth Sobol, individually and in various representative capacities, Sobol Family Partnership, LLP, Ephraim Sobol and Sobol Property Management, LLC, hereinafter referred to as the Sobol defendants unless otherwise noted, and the Bank of America, N.A (Bank of America).

In the underlying cases, the plaintiffs alleged, inter alia, breach of contract, breach of fiduciary duty, unjust enrichment, civil conspiracy and violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et. seq. The cases were scheduled for a combined jury and court trial to commence on July 8, 2008, after the completion of jury selection. On July 3, 2008, however, the Sobol defendants and the defendant Bank of America each filed a motion to enforce a settlement agreement purportedly reached with the plaintiffs on July 1, 2008. On July 8, 2008, the trial court, *Eveleigh, J.*, conducted a hearing pursuant to *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 811–12, 626 A.2d 729 (1993),[5] to determine whether the settlement agreement was enforceable, at which the plaintiffs argued that there was no agreement and the defendants argued that there was. On July 9, 2008, the court issued an oral decision from the bench containing the following findings of fact and conclusions of law.

"[T]he parties met for a mediation, which was held on May 29, 2008, before the Honorable Michael Sheldon. The plaintiffs' attorney, Glenn Coe, represented the plaintiffs at this mediation.

"At the time the mediation was concluded, a settlement had not been reached . . . although Judge Sheldon did remain active in further negotiations between the parties. These negotiations continued to the point where [Coe] made a detailed offer of settlement . . .

---

[5] A hearing pursuant to *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 811–12, is conducted to decide whether the terms of a settlement agreement are sufficiently clear and unambiguous so as to be enforceable as a matter of law. See id. Because the parties in the present case, however, also made arguments regarding the authority of the plaintiffs' attorney to settle the pending litigation, the trial court considered and ultimately decided additional matters outside the scope of a typical settlement enforcement hearing under *Audubon*.

by way of letter dated June 16, 2008, which was addressed to Attorneys [Robert] Wyld, [Dina] Fisher, and [Steven] Ecker representing the defendants in this action other than Bank of America.

"That particular letter was responded to by [Wyld] . . . in which he rejected the proposal. . . . After that rejection, negotiations continued in the matter to the point where [Coe] made an offer to settle the litigation in a series of conversations with [Wyld] and [Attorney David] Schneider [who represented the Bank of America] on Thursday, June 26, and Friday, June 27, 2008.

"[Coe] had been speaking on behalf of all [the] plaintiffs regarding settlement with the knowledge and authority of his own client[s], as well as [Attorney William Horan], who [had] represented the other two plaintiffs . . . [Rakoszynski] . . . and Mann, and that situation had continued since the time of the mediation on May 29, 2008. During that two day period of June 26 and June 27, 2008, [Coe] expressly assured [the] defendants' attorneys on separate occasions in response to direct questioning on the issue that the settlement offer proposed by him at that time was fully authorized by his client[s] as well as [Horan]; [and] that if accepted by the defendants, [it] would resolve the litigation in all respects.

"[Wyld], who was negotiating the settlement on behalf of . . . the Sobol defendants . . . notified [Coe] on Monday, June 30, 2008, that the offer of settlement made by [Coe] on behalf of all [of the] plaintiffs was accepted by the Sobol defendants. The Sobol defendants understood that the settlement between the plaintiffs and the Sobol defendants was part of a global settlement proposal made by [the] plaintiffs' counsel, and, therefore, both [Wyld] and [Coe] awaited word from [Schneider], who represented the Bank of America

in the separate actions in which Tamar Ackerman . . . and [Rakoszynski] were named plaintiffs.

"The settlement demand by [the] plaintiffs' counsel to [the] Bank of America was in the sum of $1.1 million. [Schneider], in response to that proposal, had numerous conversations with numerous bank executives on Friday, June 27, 2008, Monday, June [3]0, 2008, and Tuesday, July 1, 2008, in an effort to secure authority to accept the . . . $1.1 million demand communicated by [the] plaintiffs' counsel.

"Due to the fact that the amount of the proposal was in excess of $1 million, [Schneider] required approval at higher levels and it was difficult to gain that approval by the time period which had been expressed. Therefore, [Schneider] requested to extend . . . the deadline for . . . acceptance to 5 p.m. on July 1, which request was granted. The Bank of America, through [Schneider], accepted the $1.1 million settlement proposal in the early afternoon of July 1, 2008, prior to the 5 p.m. deadline. The global settlement offer thus [had] been accepted by all [of the] defendants.

"The plaintiffs Rena Ackerman, [Rakoszynski], and [Mann], were all present on the day that the Bank of America accepted the offer, July 1, 2008. Beginning at 9:30 that morning, the parties had convened at the Hartford offices of Shipman and Goodwin for the deposition of [Rakoszynski] and [Mann], [the] plaintiffs in [one of] the . . . cases. In particular, Rena Ackerman was present from the outset of the deposition.

"At no time prior to the acceptance of the settlement proposal on July 1, 2008, were [the] defendants or their attorneys notified that the offer had been withdrawn, unauthorized, or otherwise ineffective. During that same period [Rena] Ackerman never manifested to [the] defendants or their attorneys that the settlement authority of her attorney was limited or had been terminated.

"[Coe] is a very experienced, highly regarded lawyer. He's been representing plaintiffs and parties for over thirty years. [Coe], again, [has been] the lead negotiator in settlement discussions since May 29, 2008, in an ongoing sustained and intense series of negotiations. It was certainly clear that by May 29, 2008, he was authorized to negotiate settlement terms on the plaintiffs' behalf.

"Defense counsel had observed [Rena] Ackerman in [Coe's] presence during the mediation process and knew that [Coe] was consulting with her concerning negotiations based upon [Coe's] feedback. [Rena] Ackerman was very involved in every aspect . . . of the case, including settlement. She [is] found by the court to be a very bright person who is vigilant in pursuing and protecting her interests in these lawsuits.

"[Coe] expressly and unambiguously assured both [Wyld] and [Schneider] in separate conversations that he had authorization from [Rena] Ackerman to offer the specific settlement terms at issue. After [Wyld] informed [Coe] on June 30, 2008, that the Sobol defendants agreed to the settlement terms, [Coe] continued to inquire regarding [Schneider's] progress with the Bank of America and demonstrated no changes in the commitment to the settlement.

"On July 1, 2008, while . . . [Rena] Ackerman was physically present at the offices of Shipman and Goodwin, [Coe] continued to await word from [Schneider] regarding [the] Bank of America's willingness to settle the case for $1.1 million and extended the deadline for response from 12 noon to 5 p.m.

"The express terms of the settlement between the Sobol defendants and the plaintiffs the court finds were as testified to by [Wyld]. Part of those terms had been agreed to as expressed in [Coe's] letter dated June 16. Additional terms involved the payment of $1.4 million

from the *Sobol* defendants and a payment from Ruth Sobol resolving the probate appeal and the fees contained therein.

"The precise details at issue at the time of the negotiations which were resolved on July 1, was the additional sum of payment of $1.4 million. . . . [T]hat particular settlement [Wyld] had indicated that—and notified [Coe] on Monday, June 30, that the offer for settlement of $1.4 million in addition to the other terms previously agreed to was accepted by the Sobol defendants. . . .

"In connection with the threshold question posed by *Audubon* [*Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 811–12], the court finds that the contractual terms with respect to both Bank of America and with respect to the settlement of the Sobol defendants were clear, certain, and unambiguous.

"It further appears to the court that there was no challenge at the time of the hearing from the testimony of [Coe] himself. It was clearly expressed to Bank of America that $1.1 million would resolve the case. They came up with $1.1 million. The offer was accepted. It's further clear to the court that although there are numerous issues as testified to by [Wyld] regarding the settlement of the Sobol defendants, the one remaining issue to be resolved was the amount of money to be paid and the demand in that regard was that the Sobol defendants pay $1.4 million. They came up with the money. The proposal was accepted.

"At the time of the hearing there was no challenge from anyone [claiming] that either settlement was unclear or ambiguous . . . . Further . . . an otherwise valid settlement agreement is enforceable even if not in writing or signed by the parties.

"Having found the agreements to be clear and unambiguous, the court next moves to what is really the crux

of the issue in this particular matter and that is the apparent authority of [Coe] to make the settlement proposals and to accept the settlement on behalf of all the plaintiffs. Connecticut law is clear to the extent that under the ordinary rules of a contract, an agent who has apparent authority, but not express authority, can bind his principal especially as to parties who act in good faith . . . .

"Since the case of *Tomlinson* v. *Board of Education*, 226 Conn. 704, 734, 629 A.2d 333 (1993), the court's inquiry as to the doctrine of apparent authority is now refined to a two part analysis. Apparent authority exists, one, where the principal held the agent out as possessing sufficient authority to embrace the act in question and knowingly permitted him to act as having such authority; and, two, in consequence thereof, the person dealing with the agent acting in good faith reasonably believed under all the circumstances that the agent had the necessary authority. . . .

"Based upon the court's prior findings in this matter, the court finds that [Coe] certainly did have apparent authority from his client[s]. Further . . . the court so finds, [it was] acknowledged in testimony, that the defendants' counsel reasonably believed that [Coe] was, in fact, authorized by the plaintiffs to make the settlement offer at issue, and further, that [the] defendants' counsel at all . . . relevant times were acting in good faith in their respective efforts to settle the case on the terms proposed by [Coe].

"As noted earlier, [Coe] had been, in fact, engaged in settlement discussions with his client's obvious assent. [Rena Ackerman] had accompanied him to the mediation for over [one] month prior to the time the settlement was reached. [Coe] was certainly held out as being authorized to negotiate settlement on behalf of the plaintiffs and the defendants acted reasonably in

believing that he had authority to do so. [Coe] acknowledged in testimony that both [Wyld] and [Schneider] acted reasonably in relying on his stated authority. Further, there was no evidence at all that [Coe's] apparent authority had been terminated at any time by [Rena] Ackerman.

"We have a situation in this case that is presented to the court where [the] plaintiffs' attorney had been practicing at a major law firm for a number of years, had represented the plaintiff[s] in these actions for a number of years, had been actively engaged in settlement discussions, [and] participated in mediation supervised by Judge Sheldon. It's clear that under the circumstances of this case the two prong requirement of the *Tomlinson* case has been established and the court so finds. . . .

"The court understands the plaintiffs' attorney to indicate that there was a misunderstanding and that he did not appreciate the clients' wishes with regard to the proposal. That testimony, while unfortunate, does not change the fact that he had apparent authority to enter into these discussions and bind his client[s]. Whether that misunderstanding came before or after the proposal was made and was the result of a change of heart on the part of the client[s], the court makes no comment.

"With regard to . . . the testimony of Rena . . . Ackerman regarding the settlement discussions and her authority to [Coe] indicating that he had no authority to enter into this settlement, the court finds that her testimony is not credible.[6]

"Wherefore, in conclusion, the court grants the Bank of America's motion to enforce the settlement

---

[6] Rena Ackerman testified that she was "in shock" after Coe explained on July 1, 2008, the terms of the settlement that he had negotiated with the defendants because she purportedly had never agreed to such terms.

agreement dated July 2, 2008, the payment of $1.1 million. The court also grants the motion of [the Sobol defendants] to enforce [the] settlement agreement dated July 3, 2008, and instructs [Wyld] to draft a written agreement consistent with the terms and conditions that he testified to and [that] the court . . . finds [was] the agreement that had been reached between the parties.

"The signed settlement agreement between the parties shall be submitted for approval by the court within thirty days of this order." (Citations omitted.)

On July 28, 2008, the plaintiffs filed a motion to reargue. The trial court denied the motion on September 16, 2008. Thereafter, the plaintiffs appealed from the July 9 decision enforcing the settlement agreement to the Appellate Court.

In the meantime, Wyld filed a motion on August 7, 2008, on behalf of the Sobol defendants, for approval of a draft settlement agreement memorializing the terms of the settlement pursuant to the trial court's July 9 decision ordering the preparation of a signed agreement within thirty days. The motion noted that the plaintiffs had neither commented upon the draft agreement nor consented to sign it. On August 8, 2008, Schneider filed a similar motion on behalf of the Bank of America seeking approval of the draft agreement attached to the Sobol defendants' motion. On October 2, 2008, the trial court denied both motions, noting that "the parties cannot agree on the wording of an agreement. Further, the proposed agreement is not in accord with the settlements approved by the court. The court cannot expand the language beyond the settlement and considers some of the language beyond mere[ly] incidental to settlement language. The language proposed by both sides goes beyond what the exhibits state or what the court

heard in testimony. The court based its judgment on the exhibits and transcript."

The court entered judgment in two separate documents, which it subsequently incorporated into a single "amended judgment" dated October 7, 2008. The plaintiffs appealed from the amended judgment to the Appellate Court on October 24, 2008. Thereafter, the Appellate Court consolidated the appeal with the plaintiffs' appeal from the July 9 decision enforcing the settlement agreement, and we later transferred the consolidated appeal to this court.

I

The plaintiffs first claim that the trial court improperly granted the defendants' motions to enforce the purported settlement agreement. They specifically claim that the trial court's finding that their lead attorney, Coe, had apparent authority to settle the pending litigation was clearly erroneous because it was lacking in evidentiary support. The defendants respond that the trial court's finding of apparent authority was not clearly erroneous because it was properly supported by the evidence. We agree with the defendants.

We begin with the standard of review. It is well settled that "[t]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn [therefrom]." (Internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C. v. Beckett*, 269 Conn. 613, 636, 850 A.2d 145 (2004). Accordingly, we review the trial court's findings with regard to agency and an agent's apparent authority under the clearly erroneous standard.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing

court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 433, 487, 970 A.2d 592 (2009).

With respect to the governing legal principles, "it is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment. . . . An agent's authority may be actual or apparent. . . . Actual authority exists when [an agent's] action [is] expressly authorized . . . or . . . although not authorized, [is] subsequently ratified by the [principal]." (Citations omitted; internal quotation marks omitted.) *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 606–607, 799 A.2d 1027 (2002). In contrast, "[a]pparent authority is that semblance of authority which a principal, through his own acts or inadvertences, causes or allows third persons to believe his agent possesses. . . . Consequently, apparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Sec-

ond, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action. . . .

"Apparent authority terminates when the third person has notice that: (1) the agent's authority has terminated; (2) the principal no longer consents that the agent shall deal with the third person; or (3) the agent is acting under a basic error as to the facts. 1 Restatement (Second), Agency § 125, comment (a) (1958). Unless otherwise agreed, there is a notification by the principal to the third person of revocation of an agent's [apparent] authority or other fact indicating its termination: (a) when the principal states such fact to the third person; or (b) when a reasonable time has elapsed after a writing stating such fact has been delivered by the principal (i) to the other personally . . . . 1 Restatement (Second), [supra, § 136 (1)]. In addition, the principal can properly give notification of the termination of the agent's authority by . . . (b) giving publicity by some . . . method reasonably adapted to give the information to such third person. [Id., § 136 (3)]." (Citations omitted; internal quotation marks omitted.) *Tomlinson* v. *Board of Education*, 226 Conn. 734–35; see also *Quint* v. *O'Connell*, 89 Conn. 353, 357, 94 A. 288 (1915).

The same principles apply to the relationship between attorneys and their clients. See *Monroe* v. *Monroe*, 177 Conn. 173, 181, 413 A.2d 819 ("[i]t is hornbook law that clients generally are bound by the acts of their attorneys"), cert. denied, 444 U.S. 801, 100 S. Ct. 20, 62 L. Ed. 2d 14 (1979); *Butler* v. *Butler*, 1 Root (Conn.) 275 (1791) (attorney may bind client in legal proceeding). In the context of settlement agreements, the authority to determine whether and on what terms to settle a claim is reserved to the client *except* when the client has validly authorized the attorney to make such decisions. See 1 Restatement (Third), The Law Governing Lawyers

§ 22 (1), p. 180 (2000). Thus, an attorney with apparent authority may enter into a settlement agreement that is binding on the client. 1 Restatement (Third), Agency § 3.03, comment (b), p. 176 (2006) ("[a]pparent authority [of a lawyer in an attorney-client relationship] to effect a settlement that binds the client is present when, as in transactions of various sorts involving agents who are not lawyers, the opposing party or lawyer reasonably believes that the lawyer has actual authority to effect a settlement and that belief is traceable to manifestations of the client"). Although reviewing courts in Connecticut have acknowledged that "[a]n attorney who is authorized to represent a client in litigation does not *automatically* have either implied[7] or apparent authority to settle or otherwise to compromise the client's cause of action"; (emphasis added) *Acheson* v. *White*, 195 Conn. 211, 213 n.4, 487 A.2d 197 (1985); they also have repeatedly held that an agent with implied or apparent authority may bind the principal to an enforceable settlement agreement. See *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, supra, 260 Conn. 605 (holding that attorney had implied actual authority to bind plaintiff to agreement); *Yale University* v. *Out of the Box, LLC*, 118 Conn. App. 800, 807, 811–12, 985 A.2d 1080 (2010) (holding that trial court "properly determined that the actions and inactions of the plaintiff, the principal, caused or allowed the

---

[7] "Implied authority is actual authority circumstantially proved. It is the authority which the principal intended his agent to possess. . . . Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and [the] agent." (Citation omitted; internal quotation marks omitted.) *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, supra, 260 Conn. 607. Thus, implied authority is determined by examining the conduct of the principal and the agent, whereas apparent authority is determined by examining the conduct of the principal as manifested to the third party and which leads the third party reasonably to believe that the agent has authority to represent the principal.

defendant reasonably to believe that . . . the agent [attorney], had the [apparent] authority to enter into and to bind the plaintiff to the settlement with the defendant"); see also *In re Artha Management, Inc.*, 91 F.3d 326, 329 (2d Cir. 1996) (although decision to settle case rests with client and client does not automatically bestow authority on retained counsel, unique nature of attorney-client relationship and public policy favoring settlements support presumption that "an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so").

We consider manifestations by the client that the attorney has apparent authority in light of the applicable Restatements of the Law, which have served as authoritative support for many of our holdings. Both the Restatement of Agency and the Restatement of the Law Governing Lawyers provide that the mere act of retaining an attorney, without more, is insufficient to create apparent authority to bind the client to a settlement. See 1 Restatement (Third), Agency, supra, § 3.03, comment (b), p. 176 ("[b]y retaining a lawyer in a litigated matter, a client does not by that conduct alone create . . . apparent authority for the lawyer to enter into a settlement without the client's assent"); 1 Restatement (Third), The Law Governing Lawyers, supra, § 27, comment (d), p. 204 ("[m]erely retaining a lawyer does not create apparent authority in the lawyer to perform acts [such as whether and on what terms to settle a claim]"). Rather, manifestations of apparent authority must take the form of "conduct by a person, observable by others, that expresses meaning." 1 Restatement (Third), Agency, supra, § 1.03, comment (b), p. 56. Such conduct, however, "is not limited to spoken or written words . . . . Silence may constitute a manifestation when, in light of all the circumstances, a reasonable person would express dissent to the infer-

ence that other persons will draw from silence. Failure then to express dissent will be taken as a manifestation of affirmance." Id., p. 57. Apparent authority also may be conveyed to the third person "from authorized statements of the agent, from documents or other indicia of authority given by the principal to the agent, or from third persons who have heard of the agent's authority through authorized or permitted channels of communication. Likewise . . . apparent authority can be created by appointing a person to a position . . . which carries with it generally recognized duties . . . to do the things ordinarily entrusted to one occupying such a position . . . ." 1 Restatement (Second), Agency, supra, § 27, comment (a), p. 104. The Restatement (Third) of Agency similarly explains that "[a] principal may . . . make a manifestation by placing an agent in a defined position in an organization or by placing an agent in charge of a transaction or situation. Third parties who interact with the principal through the agent will naturally and reasonably assume that the agent has authority to do acts consistent with the agent's position or role unless they have notice of facts suggesting that this may not be so. A principal may make an additional manifestation by permitting or requiring the agent to serve as the third party's exclusive channel of communication to the principal. . . .

"If a principal has given an agent general authority to engage in a class of transactions, subject to limits known only to the agent and the principal, third parties may reasonably believe the agent to be authorized to conduct such transactions and need not inquire into the existence of undisclosed limits on the agent's authority." (Citations omitted.) 1 Restatement (Third), Agency, supra, § 3.03, comment (b), pp. 174–75.

We are also guided by the Rules of Professional Conduct, which provide the framework for the ethical prac-

tice of law in this state.[8] See generally Rules of Professional Conduct, preamble. Among these rules are that an attorney shall be truthful when dealing with others on a client's behalf; Rules of Professional Conduct 4.1 (1);[9] an attorney shall abide by the client's decision whether to settle a matter; Rules of Professional Conduct 1.2 (a);[10] and an attorney shall promptly consult with the client and secure the client's consent prior to taking action on any matter with respect to which the client's informed consent is required. Rules of Professional Conduct 1.4 (a) (1).[11] Mindful of these

[8] We note that attorneys risk possible disciplinary proceedings if they fail to comply with the rules. See Rules of Professional Conduct 8.4 ("[i]t is professional misconduct for a lawyer to: (1) [v]iolate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another"); see also Rules of Professional Conduct 8.5 (a) ("[a] lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction").

[9] Rule 4.1 of the Rules of Professional Conduct provides in relevant part: "In the course of representing a client a lawyer shall not knowingly:

"(1) Make a false statement of material fact or law to a third person . . . ." The commentary to rule 4.1 further provides in relevant part: "A lawyer is required to be truthful when dealing with others on a client's behalf . . . ."

[10] Rule 1.2 (a) of the Rules of Professional Conduct provides in relevant part: "A lawyer shall abide by a client's decision whether to settle a matter. . . ." The commentary to rule 1.2 (a) provides that the attorney has a duty to communicate with the client about such a decision in accordance with rule 1.4 (a) (1).

[11] Rule 1.4 (a) of the Rules of Professional Conduct provides in relevant part: "A lawyer shall:

"(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0 (f), is required by these Rules . . . ." Commentary to rule 1.4 (a) (1) further provides: "If these [r]ules or other law require that a particular decision about the representation be made by the client, subsection (a) (1) requires that the lawyer promptly consult with and secure the client's consent prior to taking action. See Rule 1.2 (a)."

Rule 1.0 (f) of the Rules of Professional Conduct provides: " 'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

principles, we thus examine the record to determine whether the evidence supports the trial court's factual findings under *Tomlinson*.

## A

We begin by considering whether the plaintiffs held Coe out as possessing sufficient authority to settle the litigation as required under the first prong of *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734. The plaintiffs claim that the trial court's findings that Rena Ackerman was present at the deposition on July 1, 2008, and that she " 'never manifested' " that the " 'settlement authority of her attorney was limited or had been terminated,' " were insufficient to support the conclusion that Coe had full and final settlement authority. The plaintiffs further contend that other findings by the trial court that Rena Ackerman was involved in every aspect of the litigation, including settlement, and that she is "a very bright person who is vigilant in pursuing and protecting her interests in these lawsuits," are inconsistent with the conclusion that Coe had apparent authority to settle the litigation because they show that Rena Ackerman fully participated in her legal action and would not have given settlement authority to Coe. They also contend that there is no evidentiary support for the trial court's finding that Rena Ackerman spoke for all of the other plaintiffs, including Rakoszynski and Mann. The defendants respond that the trial court's finding that Coe had apparent authority was based on a course of dealing that began, at the latest, during the court-ordered mediation on May 29, 2008, continued under court supervision through the month of June and concluded on July 1, during which time the plaintiffs consistently held Coe out as their sole spokesman on settlement matters with the power to receive, reject and make settlement offers. We agree with the defendants that the plaintiffs clothed Coe with apparent authority to settle the litigation.

It is well established that "[a] manifestation [of a principal's assent or intention] does not occur in a vacuum, and the meaning that may reasonably be inferred from it will reflect the context in which the manifestation is made. . . .

"Between particular persons, prior dealings or an ongoing relationship frame the context in which manifestations are made and understood." 1 Restatement (Third), Agency, supra, § 1.03, comment (e), p. 62. Moreover, manifestations of apparent authority may take many forms. Id., § 2.03, comment (c), p. 115. For example, "[t]he principal may make a manifestation [of apparent authority] by . . . directing or designating an agent to . . . conduct negotiations . . . or [by] placing the agent in charge of a transaction or situation." Id.; see also 3 Am. Jur. 2d 493, Agency § 79 (2002). Connecticut courts likewise have recognized that the basis of apparent authority may be a course of dealing between the agent and the principal. See *Graham* v. *Southington Bank & Trust Co.*, 99 Conn. 494, 505, 121 A. 812 (1923) (course of dealing between plaintiff receiver of corporation and defendant bank was not such that it would legally and logically support conclusion that third party was plaintiff's agent clothed with apparent authority to secure money from bank without check legally payable to him); *Pease* v. *Cole*, 53 Conn. 53, 59, 22 A. 681 (1885) (one member of copartnership had no apparent authority to bind other member by executing negotiable promissory note in name of firm for money borrowed when there had been little time for course of conduct to develop); *Yale University* v. *Out of the Box, LLC*, supra, 118 Conn. App. 808 (basis of apparent authority may be course of dealing); *Host America Corp.* v. *Ramsey*, 107 Conn. App. 849, 858–59, 947 A.2d 957 (course of dealing involving execution of certain employment agreements without board approval by chief executive officer of plaintiff corpora-

tion supported claim that officer had apparent authority to execute such agreements), cert. denied, 289 Conn. 904, 957 A.2d 870 (2008); *Hall-Brooke Foundation, Inc.* v. *Norwalk*, 58 Conn. App. 340, 346, 752 A.2d 523 (2000) (basis of apparent authority may be course of dealing); *Edart Truck Rental Corp.* v. *B. Swirsky & Co.*, 23 Conn. App. 137, 140, 579 A.2d 133 (1990) (same).

We conclude that the trial court's finding[12] that the plaintiffs clothed Coe with apparent authority to settle the litigation is supported by evidence of a course of dealing involving the plaintiffs, Coe, the defendants and the parties' attorneys that was well established before the Sobol defendants and the Bank of America accepted the global settlement offer. The plaintiffs do not dispute the trial court's finding that Coe represented all of the plaintiffs at the court-ordered mediation on May 29, 2008, during which settlement terms were discussed and Rena Ackerman and the other plaintiffs were present. Moreover, it was Coe, acting on behalf of all of the plaintiffs, who subsequently rejected the defendants' written offer in a conference telephone call scheduled by Judge Sheldon and who stated that a counteroffer might be forthcoming. Thereafter, Coe made the anticipated counteroffer on behalf of all of the plaintiffs in his June 16 letter to the Sobol defendants. It is clear that Coe was authorized to make this offer, which would have settled the litigation if accepted, because the letter contained language indicating that it pertained to all of the pending litigation and was "for settlement purposes only." Indeed, all those who later gave testimony con-

---

[12] The trial court made two types of findings. The first more general findings issues of fact were that (1) the plaintiffs had manifested by their conduct that Coe had apparent authority to settle the litigation and (2) the defendants reasonably could have believed that he had such authority. The court also made numerous subordinate factual findings. Because the more general findings relate directly to the test set forth in *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734–35, we focus principally on those findings.

cerning the letter, including Coe, Horan,[13] and the defense attorneys, understood that Coe had authority to make the offer, and the plaintiffs repeatedly concede in their appellate briefs that Coe had express, or actual, authority to do so.

Furthermore, after the Sobol defendants rejected the counteroffer, Wyld observed Rena Ackerman conferring with Coe at a hearing on June 25, 2008, to determine which issues would be tried to a jury. Thereafter, Coe made the global settlement offer to the defendants in a series of conversations with Schneider and Wyld, repeatedly assuring them that he had authority to settle the litigation for the terms under discussion. On July 1, one day after the Sobol defendants accepted the offer, the plaintiffs Rena Ackerman, Rakoszynski and Mann were present with Coe at the Hartford offices of Shipman and Goodwin for the depositions of Rakoszynski and Mann. On that day, Coe and Wyld, who also was present, were waiting to hear from Schneider whether the Bank of America would accept the terms that Coe had offered and that the Sobol defendants had accepted one day earlier. Wyld and Schneider both observed Rena Ackerman and her husband at the offices, where they met with Coe from time to time and were seen conferring with Coe before Schneider called to inform them that the Bank of America had accepted the offer, thus settling the litigation. There was no apparent discord or distance in the relationship between Coe and Rena Ackerman and no one objected to Coe's extension of the deadline for the Bank of America to respond from noon until 5 p.m. In other words, Ackerman manifested by her conduct during the times she was observed with Coe prior to the offer's acceptance that she was aware of, and fully supported, the global settlement offer.

---

[13] Horan specifically testified that the counteroffer in the letter of June 16 had been authorized by his clients.

In addition, none of the plaintiffs, including Rena Ackerman, who was described by the trial court as "a very bright person who is vigilant in pursuing and protecting her interests," indicated by their conduct prior to the Bank of America's acceptance of the offer that Coe did not have continued authority to settle the litigation. Specifically, there is no evidence that the plaintiffs notified any third person that they had revoked Coe's authority following the defendants' rejection of their counteroffer, or that Coe no longer was representing Rakoszynski and Mann during the negotiations in June. This conclusion is supported by Rena Ackerman's testimony that she had authorized Coe to engage in settlement discussions with other counsel, and that she never notified any other person involved in the negotiations that she had limited or revoked Coe's authority after June 16 to reach a settlement on her behalf. Consistent with this testimony, Horan, who represented Rakoszynski and Mann, testified that he did not participate in the settlement negotiations that took place between June 26 and July 1, that he had many discussions with Coe during that period and that he had authorized Coe to engage in the ongoing negotiations after the defendants had rejected the offer of June 16. Further, no one testified that Horan notified any third party that Coe was not authorized to represent Rakoszynski and Mann or to make a settlement offer to the defendants between June 16 and the Bank of America's acceptance of the offer on July 1. Accordingly, the evidence unequivocally supports the trial court's finding that the plaintiffs held Coe out as possessing the necessary authority to settle the litigation by (1) authorizing him to represent them at the court-ordered mediation, reject the defendant's written proposal that followed the mediation and convey the June 16 counteroffer, (2) communicating with Coe in the presence of the defendants at various times during the

ongoing negotiations after June 16, and (3) failing to revoke Coe's authority or to inform any third person that Coe no longer had authority to settle the litigation after June 16.

The plaintiffs argue that the present case is virtually identical to *Auvil* v. *Grafton Homes, Inc.*, 92 F.3d 226 (4th Cir. 1996), in which the United States Court of Appeals for the Fourth Circuit concluded that the attorney who represented the plaintiff had no apparent authority to settle the case. We disagree. In *Auvil*, counsel for the parties met before a pretrial deposition to discuss settlement and agreed to terms that they then recommended to their clients. Id., 228. After the plaintiff met with his attorney to discuss the proposed settlement terms, the plaintiff returned to his home. Id. His attorney later told opposing counsel that the plaintiff had agreed to the settlement. Id. Thereafter, counsel put the terms of the agreement on the record before the court reporter. Id. When the plaintiff later denied that he had agreed to the settlement, the defendant moved to enforce it. Id. At the enforcement hearing, the plaintiff's attorney testified that when he first had met with the defendant's counsel he had only been authorized to negotiate a settlement on the plaintiff's behalf and he had not been authorized to settle the case without the plaintiff's approval. Id. He also testified that he had recommended that the plaintiff accept the settlement, and believed that the plaintiff had authorized him to proceed before he left the building. Id. In direct contradiction to this testimony, the plaintiff testified that his attorney never had presented him with a settlement proposal and that he never had authorized his attorney to settle the case. Id., 229. Instead, the plaintiff represented that his attorney had told him that there were serious problems with the case and that he and his wife should " 'get on with [their] lives,' " thus retreating from his earlier view that the case was strong.

Id. The District Court declined to enforce the settlement agreement because of the disputed issue of fact, but, on reconsideration, granted enforcement on the basis that the plaintiff's attorney had apparent authority to settle the dispute. Id.

On appeal, the Fourth Circuit concluded that the District Court mistook the plaintiff's manifestations of authority to negotiate a settlement for manifestations of authority to execute a settlement, that the fact that the plaintiff had left the building communicated nothing about his attorney's authority, and that his attorney's statement that the plaintiff had agreed to the settlement was insufficient to permit a finding of apparent authority. Id., 230–31. The court thus reversed and remanded the case with direction to the District Court to decide the factual conflict between the plaintiff and his attorney on the issue of actual authority. Id., 231.

The present case is distinguishable from *Auvil* because it is undisputed that Coe had actual authority to make the June 16 settlement offer that would have been binding on the plaintiffs. Moreover, because the plaintiffs never gave any indication that they had revoked this authority with respect to future offers, they cloaked Coe with apparent authority to make offers of settlement. In addition, Coe repeatedly assured Schneider and Wyld that he had the necessary authority. Accordingly, *Auvil* is inapposite because in that case there was no similar course of conduct indicating that the plaintiff's attorney had apparent authority, not merely to negotiate, but to reach a binding settlement agreement on behalf of his client.

The plaintiffs also rely on *New England Educational Training Service, Inc.* v. *Silver Street Partnership*, 148 Vt. 99, 100, 528 A.2d 1117 (1987), in which the Vermont Supreme Court rejected the claim that the defendant's attorney had apparent authority to settle the litigation.

In that case, the defendant had given its attorney express authority to conduct negotiations with the plaintiff and to settle the case for $10,000, but, after the plaintiff rejected that offer, the attorney settled the case for $60,000. Id., 101. The trial court granted the plaintiff's motion for summary judgment on the ground that the settlement agreement was enforceable. Id. On appeal, the Vermont Supreme Court concluded that, because there was no evidence that the defendant had authorized its attorney to settle the case for $60,000, the trial court's decision could be sustained only if the evidence demonstrated that the defendant's counsel had implied or apparent authority to settle the case for the higher amount. Id., 103. After determining that the attorney had no such implied authority, the court concluded that he also had no apparent authority because there was "absolutely no evidence in the record of conduct on the part of the principal . . . which could reasonably have been relied on by [the] plaintiff as a manifestation of the authority of its agent to conclude a binding settlement agreement." Id., 105. Mere retention of the attorney to conduct settlement negotiations and an " 'atmosphere of offers' " was no substitute for conduct on the part of the principal to support a finding of apparent authority. Id., 106. The Vermont Supreme Court therefore reversed the judgment. Id.

We conclude that *New England Educational Training Service, Inc.*, like *Auvil*, is inapposite because Coe engaged in a course of dealing with the defendants for more than one month during which the plaintiffs indicated by their conduct that Coe had authority to receive, reject and make settlement offers, beginning with the court-ordered mediation on May 29, continuing with his rejection of the defendants' written offer and his June 16 counterproposal, and culminating in the final days of June, when he made the global settlement offer, assured Schneider and Wyld that he had the

authority to make the offer and was observed several times conferring with Rena Ackerman. Accordingly, we conclude that the first prong of the test set forth in *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734, is satisfied because the trial court's factual finding that the plaintiffs held Coe out as having sufficient authority to settle the litigation is supported by the evidence.

B

We next consider whether the trial court properly found that the defendants reasonably could have believed that Coe had apparent authority to settle the litigation as required under the second prong of *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734–35. The plaintiffs claim that the record contains no facts that would support a reasonable belief by any third person that Coe had full and final settlement authority. Relying on rule 1.2 (a) of the Rules of Professional Conduct,[14] they specifically claim that settlements normally are subject to approval by the client, and that, in this case, they did not approve the global settlement offer. They further point to various facts and findings by the trial court suggesting that they did not agree to the terms negotiated by Coe, including that Rena Ackerman was "vigilant in pursuing and protecting her interests" and that there was no written document memorializing the global settlement offer that they had an opportunity to review. The defendants respond that other ethical rules render the defendants' belief in Coe's apparent authority reasonable in these circumstances. The defendants also note that Coe himself admitted that it was reasonable for the defense attorneys to rely on his assurances that the plaintiffs had clothed him

---

[14] Rule 1.2 (a) of the Rules of Professional Conduct provides in relevant part: "A lawyer shall abide by a client's decision whether to settle a matter. . . ."

with authority to settle the case. Finally, the defendants argue that an oral agreement may be just as binding as a written one and that nothing regarding the terms of the agreement in this case rendered it unreasonable to believe that the plaintiffs had authorized the agreement. We agree with the defendants that the record contains sufficient evidence to support the trial court's finding that they reasonably could have believed that Coe had apparent authority to settle the litigation.

As previously noted, the second prong of the test set forth in *Tomlinson* requires evidence that "the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." (Internal quotation marks omitted.) *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734–35; see also *Quint* v. *O'Connell*, supra, 89 Conn. 357. In the present case, it is undisputed that Coe represented all of the plaintiffs when he rejected the defendants' written settlement offer and when he made the counteroffer to the defendants in his letter of June 16. Thereafter, the plaintiffs gave no notice to the defendants or their counsel that Coe no longer had authority to continue settlement negotiations or to make settlement offers on their behalf. Rather, Rena Ackerman was seen conferring with Coe at a court proceeding in late June and at the depositions on July 1, when settlement negotiations intensified. Thus, simply on the basis of this course of dealing among the parties, the defendants reasonably could have believed that Coe continued to have authority to discuss settlement terms and to make settlement offers during the middle and latter part of June.

To the extent that the defendants did not have a reasonable belief that Coe had apparent authority to bind the plaintiffs, they testified at the hearing to enforce the settlement agreement that they not only

had queried Coe repeatedly on June 26 and 27, to obtain such assurances, but that Coe had answered their questions plainly and directly and told them at various times throughout the negotiations whether he did or did not have such authority. Schneider specifically testified that Coe had told him earlier in the month that he did not have a firm number in mind on which to base a settlement offer but that he would get back to Schneider when he had such a figure. Several days later, on or about June 26, Coe and Schneider continued discussing settlement terms, and Coe stated that he hoped to have a number later that afternoon. After Schneider returned to his Bank of America office, Coe telephoned at approximately 4 p.m. to inform him that the settlement number was $1.2 million. When Schneider pressed him for a lower number, Coe responded that $1.1 million would be acceptable but that he had no room to maneuver below that amount. He also assured Schneider that he was acting on behalf of all of the plaintiffs in the cases in which the Bank of America was a party. On the basis of these conversations, Schnieder thus reasonably believed that Coe had authority to settle the litigation for the financial terms they had discussed during the last days of June.

Wyld gave similar testimony. He stated that he had met with Coe on June 24, after a deposition at his offices and that the two had engaged in an extended conversation during which Coe had outlined the possible terms of a settlement. Wyld told Coe that he believed the approach had a prospect of success with his clients, the Sobol defendants, and urged Coe to obtain the authority he needed to make an official proposal. Wyld testified that it was clear to him that Coe did not have authority to make a formal offer at that time and would be required to go back to his clients, and that he, Wyld, had told Coe that he would not discuss the matter with

his own clients until Coe had secured the necessary authority.

Wyld subsequently attended a court proceeding on June 25, where he saw Rena Ackerman with her attorneys. Late in the afternoon on June 26, Coe telephoned Wyld to continue their discussion of two days earlier. Wyld testified that it was implicit that Coe had spoken with his client and obtained the necessary authority to make a formal settlement offer because he and Coe had parted on June 24, with the understanding that they would not speak further until he had obtained such authorization. At the end of their conversation, Wyld told Coe that he also wanted assurances that the Bank of America would fund its portion of the settlement because it was clearly intended to be global, and Wyld encouraged Coe to speak with Schneider. Wyld himself telephoned Schneider after his conversation with Coe and learned that Coe had spoken with Schneider.

On June 27, discussions among Coe, Wyld and Schneider continued. Wyld testified that he had telephoned Coe late in the day "to pin [him] down" concerning the terms relating to the Sobol defendants because the Bank of America discussions appeared to be progressing, and Wyld had wanted to make sure that there was no misunderstanding as to the settlement terms or Coe's authority to settle. Wyld emphasized that he wanted to confirm "very precisely and very directly" that Coe had authority to make the offer, and that Coe had confirmed that he had the necessary authority. Wyld subsequently reiterated that he believed Coe had authority to represent both Rena Ackerman and Horan's clients, Rakoszynski and Mann, at that time, because the global settlement proposal included terms affecting all of their interests and Wyld had questioned Coe specifically on that subject. Coe then testified that he did not dispute Wyld's testimony and that it was not unreasonable for Wyld to have relied on Coe's clear assurances that he had

the required authority to make the global settlement offer. Accordingly, Wyld, like Schneider, also reasonably believed that Coe had authority to settle the litigation at the end of June, not only because Coe had been acting on behalf of all of the plaintiffs since May 29, but also because Coe had assured Wyld that he had such authority. See 1 Restatement (Second), Agency, supra, § 27, comment (a), p. 104 (apparent authority may be conveyed to third person by authorized statements of agent).

Wyld and Schneider were further justified in believing that Coe's statements were authorized because, as previously noted, Connecticut attorneys are required to conduct their professional affairs in accordance with the Rules of Professional Conduct. Accordingly, Wyld and Schneider reasonably relied on Coe's repeated assurances that he had secured the plaintiffs' consent to the terms of the global settlement offer because, to borrow the plaintiffs' own language, an attorney with Coe's "abundance of experience and exemplary reputation" never would have misrepresented his authority in such a matter in violation of the rules. Coe's assurances were even more authentic in light of his occasional admissions that he did *not* have authority to agree to certain settlement figures at various times during the final settlement negotiations. To the extent that the plaintiffs now claim that Coe was not authorized to settle the litigation for the terms incorporated in the final agreement, they confuse their clear manifestations of authority with Coe's conceded misunderstanding of their position, a fact of significance, but one that cannot be allowed to affect our conclusion that Coe nonetheless had apparent authority to settle the claim, regardless of whether he misunderstood their thinking or properly exercised that authority. Consequently, given the circumstances in the present case, namely, that Coe and the plaintiffs were in an attorney-client relationship

subject to the expectations that normally apply to attorneys involved in complex negotiations with other attorneys, we conclude that the evidence was sufficient to support the trial court's conclusion as to Coe's apparent authority under the second prong of *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734–35.

The plaintiffs argue that our decision in this case should be governed by *Makins* v. *District of Columbia*, 861 A.2d 590, 595–97 (D.C. Cir. 2004), in which the District of Columbia Court of Appeals held that the plaintiff's attorney did not have apparent authority to settle the parties' dispute. In *Makins*, the District Court ordered that the parties' lead attorneys appear for a settlement conference and that the parties themselves either attend the conference or be available by telephone for its duration. Id., 592. The plaintiff was not present at the conference and her attorney negotiated a settlement. Id. After the negotiations, the plaintiff's attorney left the conference room carrying his cellular telephone, apparently to contact the plaintiff. Id. Upon his return, the attorneys " 'shook hands' " on the settlement agreement and put it in writing, but the plaintiff refused to sign the agreement several days later. Id.

At the evidentiary hearing on the defendant's motion to enforce the agreement, the plaintiff and her attorney gave conflicting testimony as to whether the attorney had authority to settle the issue. Id. Instead of resolving this factual dispute, however, the District Court assumed that the attorney did not have actual authority and granted the motion to enforce the settlement agreement on the alternative ground that the attorney had apparent authority to bind the plaintiff. Id., 592–93. On appeal, the District of Columbia Court of Appeals rendered its decision on narrow grounds and determined that the two client manifestations contained in

the certified question,[15] which consisted of sending the attorney to the court-ordered settlement conference and permitting the attorney to negotiate on the client's behalf, were insufficient to support a reasonable belief by the defendant that the attorney had authority to settle the case. Id., 596. The court determined that "[s]ome additional manifestation by [the plaintiff]" was necessary to establish that she had given her attorney final settlement authority and that the defendant had pointed only to actions and representations by the plaintiff's attorney, and not by the plaintiff herself, as support for the reasonableness of its belief.[16] Id. *Makins* is unlike the present case because, here, the parties were engaged in a course of dealing over an extended period of time during which the plaintiffs and Coe, as previously described, clearly demonstrated by their conduct that the defendants reasonably could have believed that Coe had authority to reach a settlement agreement on behalf of all of the plaintiffs.[17]

---

[15] The following question was certified to the court: "Under District of Columbia law, is a client bound by a settlement agreement negotiated by her attorney when the client has not given the attorney actual authority to settle the case on those terms but has authorized the attorney to attend a settlement conference before a magistrate judge and to negotiate on her behalf and when the attorney leads the opposing party to believe that the client has agreed to those terms." (Internal quotation marks omitted.) *Makins* v. *District of Columbia*, supra, 861 A.2d 592.

[16] For example, the defendant asserted that the attorney represented that the plaintiff was available by telephone and that he would consult with her when appropriate, that the attorney spoke with the plaintiff on his cellular telephone at least three times during the conference and that the attorney left the conference room at one point to telephone the plaintiff concerning the latest settlement proposal and returned with his telephone in hand to accept the proposal with one new condition. *Makins* v. *District of Columbia*, supra, 861 A.2d 596.

[17] For similar reasons, the Fourth Circuit's conclusion in *Auvil* that an attorney's mere presence at a deposition does not support a reasonable belief by opposing counsel that the attorney has apparent authority; *Auvil* v. *Grafton Homes, Inc.*, supra, 92 F.3d 231; is irrelevant in the present context. As previously stated, there were many manifestations by the plaintiffs that caused the defendants and their counsel reasonably to believe that Coe had conveyed the proposed settlement terms to the plaintiffs and had

Insofar as the plaintiffs claim that it was unreasonable for the defendants to believe that, because the oral agreement was not in writing, it was not fully authorized, we disagree. The trial court correctly noted that "the fact that an oral agreement was later to be memorialized in writing does not make it any less enforceable." See *Nanni* v. *Dino Corp.*, 117 Conn. App. 61, 67, 978 A.2d 531 (2009) (fact that settlement agreement was not reduced to writing or signed by parties does not preclude agreement from binding parties if terms are clear and unambiguous); *Aquarion Water Co. of Connecticut* v. *Beck Law Products & Forms, LLC*, 98 Conn. App. 234, 239, 907 A.2d 1274 (2006) ("settlement in principle on entire matter" bound parties to terms, even though unsigned, if assent was otherwise indicated); *Sicaras* v. *Hartford*, 44 Conn. App. 771, 778, 692 A.2d 1290 (parties bound to terms of unsigned contract if assent was otherwise indicated), cert. denied, 241 Conn. 916, 696 A.2d 340 (1997). Thus, trial courts in Connecticut have declared repeatedly that a valid settlement agreement need not be in writing and that oral settlement agreements are enforceable; see, e.g., *Montgomery* v. *Smith*, 40 Conn. Sup. 358, 361, 499 A.2d 444 (1985); *Cyr* v. *Switzer*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV-96-563599 (July 13, 1998); *White* v. *Branchini*, Superior

authority to settle the case. These included observing the plaintiffs together with Coe when negotiations intensified at the end of June and Coe's assurances to the defendants that he had authority to settle the litigation for the financial terms proposed in the global settlement offer. Nor does the fact that the settlement agreement in *Sicaras* v. *Hartford*, 44 Conn. App. 771, 775, 692 A.2d 1290, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997), was read in open court have any relevance in this case. The plaintiffs cite no authority for their claim that all settlement agreements must be presented in open court where clients may be canvassed to ascertain whether they understand and accept the settlement terms. Indeed, it would be impractical to require agreements to be in writing or verified in open court when the parties cannot always be present, especially when formal litigation has not yet commenced and attorneys are engaging in extensive communications regarding discovery and other pretrial matters.

Court, judicial district of New Haven at New Haven, Docket No. 377336 (March 1, 1996); as have the courts of other jurisdictions. See *Dillard* v. *Starcon International, Inc.*, 483 F.3d 502, 506 (7th Cir. 2007); *Chaganti & Associates, P.C.* v. *Nowotny*, 470 F.3d 1215, 1221–23 (8th Cir. 2006); *Quint* v. *A.E. Staley Mfg. Co.*, 246 F.3d 11, 15 (1st Cir. 2001), cert. denied, 535 U.S. 1023, 122 S. Ct. 1618, 152 L. Ed. 2d 631 (2002). We thus conclude that the trial court's finding that Coe had apparent authority to settle the litigation is supported by the evidence and is legally correct, and, accordingly, that the plaintiffs' claim that the settlement agreement is unenforceable under *Tomlinson* v. *Board of Education*, supra, 226 Conn. 734–35, has no merit.

## II

The plaintiffs also seek review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[18] or the plain error doctrine of their unpreserved claim that they had a constitutional right to a jury trial on the factual question of whether there was a settlement. The plaintiffs claim that the parties were engaged in the process of selecting a jury when the trial court improperly found facts and rendered the judgment that the settlement agreement was enforceable. They claim that enforcement of the purported settlement agreement extinguished their legal and equitable claims, that they timely asserted their right to a trial by a jury, that they did not choose a forum in which there would be no opportunity for a jury trial and that they did not waive their right to a jury trial by their silence. They further claim that plain error review is required to avoid the manifest injustice of being inadvertently deprived of their fundamental right to a jury trial. The defendants respond that the plaintiffs had no right to a jury trial on the settlement

---

[18] *Golding* review applies in civil as well as criminal cases. See *Perricone* v. *Perricone*, 292 Conn. 187, 212 n.24, 972 A.2d 666 (2009).

enforcement proceeding because the proceeding was legally distinct from the underlying claims, the plaintiffs did not ask for a jury, and the record is inadequate for review. The defendants also argue that a settlement agreement is a contract among the parties and that there is no right to a jury trial on a motion to enforce a settlement agreement because a claim of specific performance invokes the trial court's equitable powers. We agree with the defendants that the plaintiffs had no constitutional right to a jury trial on the defendants' motions to enforce the settlement agreement and, accordingly, the defendants' claim must fail under both *Golding* and the plain error doctrine.

## A

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40. "The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 90, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

In the present case, the record is adequate for review and the plaintiffs' claim is of constitutional magnitude alleging the violation of a fundamental right. We con-

clude, however, that the claim must fail.under the third prong of *Golding*.

Article first, § 19, of the constitution of Connecticut, as amended by article four of the amendments, provides in relevant part: "The right of trial by jury shall remain inviolate . . . ." The provision "guarantees the right to a jury trial in all cases for which such a right existed at the time of the adoption of that constitutional provision in 1818." (Internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, 246 Conn. 1, 9, 715 A.2d 748 (1998). The fundamental right to a jury trial, however, is subject to certain limitations. Id. One limitation is that the right does not extend to equitable claims. *Franchi* v. *Farmholme, Inc.*, 191 Conn. 201, 210, 464 A.2d 35 (1983). "Our case law has spoken to the resolution of factual issues in the context of actions essentially equitable or essentially cognizable at law . . . [and we have stated that] [w]here incidental issues of fact are presented in an action essentially equitable, the court may determine them without a jury in the exercise of its equitable powers." (Citation omitted; internal quotation marks omitted.) Id. "[T]he true test of a right to a jury trial is whether the cause of action stated (rather than merely the relief claimed) is essentially legal as distinguished from essentially equitable." (Internal quotation marks omitted.) Id., 211.

The cause of action in the present case involves enforcement of a settlement agreement. A settlement agreement, or accord, is a contract among the parties. *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 809; id. ("An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty. Performance of the accord discharges the original duty." [Internal quotation marks omitted.]); see also 2 Restatement (Second), Contracts § 281, p. 382 (1981). Under the law of contracts, we

have stated that when a contract is breached by the obligee, "the obligor may maintain a suit for specific performance of the accord, in addition to any claim for damages for partial breach." (Internal quotation marks omitted.) *Tolland Enterprises* v. *Scan-Code, Inc.*, 239 Conn. 326, 334, 684 A.2d 1150 (1996), quoting 2 Restatement (Second), Contracts, supra, § 281 (3), p. 382; see also *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 809 ("[i]f there is a breach of the accord, the obligee has the option of either seeking enforcement of the original duty or seeking enforcement of any obligation under the accord"). It is well established that an action for specific performance invokes the equitable powers vested in the trial court. *Natural Harmony, Inc.* v. *Normand*, 211 Conn. 145, 149, 558 A.2d 231 (1989); 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 457 ("where the specific execution of a personal contract, is necessary to do essential justice, and answer the substantial intent of the parties; courts of equity will decree the agreement specifically"); 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 16 ("courts of equity have the power to decree the specific execution of agreements"). This court has also recognized that where the remedy is equitable, there is no right to a jury trial. See *Bender* v. *Bender*, 292 Conn. 696, 714, 975 A.2d 636 (2009) (no right to jury trial in action for specific performance); *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 212 Conn. 83, 91, 561 A.2d 917 (1989) (same); *Texaco, Inc.* v. *Golart*, 206 Conn. 454, 458, 538 A.2d 1017 (1988) ("[i]t is well settled that the right to a jury trial under article first, § 19, of the Connecticut constitution, as amended, does not include a right to a jury trial in an equitable action"). Thus, "[a] trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the

agreement are clear and unambiguous. . . . A court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings. . . .

"Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes. When parties agree to settle a case, they are effectively contracting for the right to avoid a trial." (Citations omitted; internal quotation marks omitted.) *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, supra, 225 Conn. 811–12.

Consistent with the foregoing principles, many state and federal courts have denied claims for a jury trial when parties seek the specific enforcement of settlement agreements. See *Ford* v. *Citizens & Southern National Bank*, 928 F.2d 1118, 1122 (11th Cir. 1991) ("purely equitable claims, even those involving factual disputes, are matters to be resolved by the court rather than a jury"); *Adams* v. *Johns-Manville Corp.*, 876 F.2d 702, 709–10 (9th Cir. 1989) (motion to enforce settlement agreement does not give rise to right to jury trial); *Warner* v. *Rossignol*, 513 F.2d 678, 683–84 (1st Cir. 1975) (no right to jury trial for claim for specific performance of settlement agreement); *Calabi* v. *Government Employees Ins. Co.*, 353 Md. 649, 653–56, 728 A.2d 206 (1999) (no constitutional right to jury trial for proceedings in equity); *McDowell Welding & Pipefitting, Inc.* v. *United States Gypsum Co.*, 345 Or. 272, 278–87, 193 P.3d 9 (2008) (rejecting state constitutional claim for jury trial on settlement enforcement proceeding).

We thus conclude that the plaintiffs' claim must fail under *Golding*'s third prong because they had no right

to a jury trial on issues raised in connection with enforcement of the settlement agreement. Even if certain factual matters were disputed, the motion to enforce was essentially equitable in nature and, consequently, the court was entitled to use its equitable powers to resolve the dispute without a jury.

The plaintiffs rely on two cases from other jurisdictions in maintaining that they have a right to a jury trial. In *Turner* v. *Burlington Northern Railroad Co.*, 771 F.2d 341, 342–43 (8th Cir. 1985), in which the defendant, a railroad machinist, sought specific performance of an alleged settlement agreement, the United States Court of Appeals for the Eighth Circuit noted that "[a]n action for specific performance without a claim for damages is purely equitable and historically has . . . been tried to the court," but rejected the defendant's claim that the enforcement action in that case should be resolved by the court. The 8th Circuit further observed that "[t]he seventh amendment, guaranteeing the right to jury trials, does not bar Congress or the Supreme Court from expanding the right to jury trials to cases which were traditionally tried to the court" and that "Congress has on rare occasions extended this right in this manner." Id., 343. The court explained, however, that in cases like the one before it, which had been brought under the Federal Employers' Liability Act (liability act), 45 U.S.C. § 51 et seq. (1982), the United States Supreme Court had emphasized repeatedly that Congress intended that actions brought under the liability act would be tried to a jury. Id., 344. The court stated that the right to a trial by jury is "part and parcel of the remedy afforded railroad workers under the [liability act]," and that "to deprive railroad workers of the benefit of a jury trial . . . is to take away a goodly portion of the relief which Congress has afforded them." (Internal quotation marks omitted.) Id. Accordingly, the Eighth Circuit, relying on Congressional authority, rejected the

defendant's claim. Id., 345. In the present case, there being no similar statutory authority for a jury trial, the plaintiffs' reliance on *Turner* is misplaced because that case is factually and legally distinguishable.

*Hays* v. *Monticello Retirement Estates, LLC*, 192 P.3d 1279 (Okla. Civ. App. 2008), is also inapposite. In *Hays*, the trial court sustained the defendants' motion to enforce a written settlement agreement that had been negotiated by the parties' attorneys, but that the plaintiff had refused to sign. Id., 1280–81. On appeal, the reviewing court relied on Oklahoma case law stating that "[a] motion to enforce a settlement agreement is treated as a motion for summary judgment" and that "whether a settlement agreement has been reached . . . may be a question for the jury." Id., 1281. After noting that a substantial dispute existed as to whether the plaintiff had given her attorney authority to settle the matter without her consent, the court summarily stated that "[w]hen material facts are in dispute, summary judgments or orders to enforce settlement agreements may not be granted." Id. The court thus concluded that, because the material facts in *Hays* were in dispute, the trial court improperly had granted the motion to enforce the agreement, and it reversed and remanded the case for further proceedings. Id., 1282.

*Hays* is clearly irrelevant in the present circumstances because Oklahoma law governing settlement agreements differs in significant respects from Connecticut law, which does not treat motions to enforce settlement agreements like summary judgment motions but, rather, as equitable claims subject to resolution by the court. Accordingly, the unique posture Oklahoma has adopted in such matters is inapplicable in the context of Connecticut law.

## B

The plaintiffs finally seek review under the plain error doctrine, which is codified at Practice Book § 60-5.[19] They claim that there was manifest injustice in the fact that they were deprived of their fundamental right to a jury trial because, in the absence of a canvass of all of the parties by the trial court or a signed settlement document, there were material questions of fact as to whether they had apparently authorized the settlement. In light of our conclusion that the plaintiffs had no right to a jury trial on their equitable claim for specific enforcement of the settlement agreement; see part II A of this opinion; we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[19] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."