## MARY BROOKS *v.* SCOTT BROOKS
## (AC 30140)

Bishop, Gruendel and Schaller, Js.

Argued April 13—officially released June 1, 2010*

*Steven D. Ecker*, with whom, on the brief, was *Alinor C. Sterling*, for the appellant (defendant).

*Kenneth J. Bartschi*, with whom were *Wesley W. Horton* and, on the brief, *David Eric Ross*, for the appellee (plaintiff).

*Opinion*

BISHOP, J. This marital dissolution appeal requires us to consider the correctness of the trial court's lump sum alimony order where it was expressly based on an asset valuation determined by the court through a flawed process. Because the court expressly premised its valuation of the defendant's minority stock holdings

---

* June 1, 2010, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

in six limited liability companies solely on the basis of the market value of real estate and cash held by those entities, less attendant mortgages, without regard to his minority shareholder status and the limitations of applicable shareholder buy and sell agreements, the lump sum alimony order cannot withstand appellate scrutiny. Accordingly, we reverse the judgment of the trial court only with respect to the financial orders.

The following procedural history and facts are relevant to our discussion of the issues at hand. The plaintiff, Mary Brooks, and the defendant, Scott Brooks, were married in 1993 and have one child who was twelve years old at the time of dissolution.[1] The dissolution trial took place over five days in January and February, 2008. The court heard evidence from both parties, a real estate appraiser and an accountant on behalf of the plaintiff, and several medical professionals regarding the plaintiff's health status and her employability.

The court heard evidence that the forty-eight year old plaintiff, who does not have a college degree, did not hold employment outside of the household during the course of the marriage. Although the court was not persuaded by her testimony that she suffered from Lyme disease, chronic fibromyalgia and chronic fatigue syndrome, the court found that due to her limited education and lack of work experience outside of the home, she was unlikely to ever generate substantial income. As to the claims regarding her medical condition and attendant impairments, the court concluded in sparse terms that "she is simply tired of the marriage."

The court also heard testimony that the fifty year old defendant, a college graduate, is engaged in the real estate business with his father and his brother. As to

---

[1] During the course of the hearing, the parties presented a detailed shared parenting plan that the court adopted. The parenting plan is not at issue on appeal.

the defendant's financial condition, and in regard to the defendant's income, the plaintiff adduced evidence that the defendant receives an annual gross salary of $165,000 and, in addition, he has periodically received quarterly dividends of $29,000 and an annual bonus in the range of $3000 to $4000.[2] These payments are in addition to periodic distributions he has received on the occasion of the sale or refinancing of an asset by one or more of the limited liability corporations in which he has an interest.[3]

Much of the evidence adduced at trial concerned the defendant's interests in various family businesses. The defendant holds noncontrolling interests in six closely held entities: Westfair, Inc.; Westbrook, Inc.; Brooks, Torrey & Scott, Inc.; Milford Realty Corporation; Liberty Rock Realty, LLC; and Granite National Realty, LLC.[4] The companies are engaged in either leasing, or in the case of Brooks, Torrey & Scott, Inc., leasing and managing, commercial real estate. As its principal asset, each business holds a piece of commercial real estate that is leased to various business tenants.

As to the defendant's interests in these parcels of real estate, the plaintiff offered the testimony of Patrick J. Wellspeak, a commercial real estate appraiser to

[2] The defendant's tax returns, which take into account the defendant's income from his employment as a property manager, in addition to taxable interest, dividends and capital gains, reflect the defendant's annual income as follows: 2003, $383,954; 2004, $496,350; 2005, $270,423; and 2006, $268,119.

[3] The defendant also has a one-third vested remainder interest in a testamentary trust in which his father is the lifetime income beneficiary. As to the trust, there was undisputed evidence that the defendant had received an advance of $750,000 against his expectancy in this trust and that the distribution of these funds had been utilized to purchase the family home that the parties agreed would be assigned to the plaintiff.

[4] At the time of trial, the defendant had a 23.33 percent interest in Westfair, Inc.; a 24.17 percent interest in Westbrook, Inc.; a 23.68 percent interest in Brooks, Torrey & Scott, Inc.; a 33.33 percent interest in Milford Realty Corporation; a 25.5 percent interest in Granite National Realty, LLC; and a 25 percent interest in Liberty Rock Realty, LLC.

value the properties owned by corporations in which the defendant had shareholdings but, significantly, not to value the defendant's interest in these entities. Wellspeak testified that he utilized the market value approach in formulating his appraisal of the real estate held by the limited liability corporations in which the defendant had an interest. Doing so, he concluded that the aggregate fair market value of the properties, as of August 23, 2006, was $61,100,000.[5] The report prepared by Wellspeak and admitted into evidence indicated that his report was confined to real estate values and that "[i]t is likely that this is only the first issue to be addressed as there are issues relating to outstanding debt and the valuation of the stock which is beyond my expertise." In response to questioning by the defendant, Wellspeak reiterated that his expertise did not extend to the valuation of stock in a closely held corporation or the value of a person's interest in such a corporation. In short, the record is plain that Wellspeak testified only as to the real estate values of the properties held by the limited liability corporations in which the defendant had minority interests and he disclaimed any ability to value the defendant's shareholdings in the companies that owned the real estate he had appraised.

Also testifying at the behest of the plaintiff was David Gallagher, a certified public accountant who had provided accounting services to the parties and to the businesses in which the defendant had interests. Through Gallagher, the plaintiff introduced into evidence the parties' federal tax returns for several years and federal tax returns and financial statements for several years for the six limited liability corporations in which the

[5] As of August 23, 2006, Wellspeak determined the fair market value of the various real estate holdings as follows: by Westfair, Inc., $20.5 million; by Westbrook, Inc., $20 million; by Brooks, Torrey & Scott, Inc., $1.6 million; by Liberty Rock Realty, LLC, $12 million; by Milford Realty Corporation, $2 million; and by Granite National Realty, LLC, $5 million.

defendant had shareholdings. Additionally, the plaintiff introduced a personal financial statement prepared by the Gallagher firm for the defendant as of March 1, 2005. Although none of the documents presented by the plaintiff states a fair market value for the defendant's stock in any of the businesses in which he has an interest, his financial statement posits $449,000 as the net book value of his investments in these closely held businesses as of December 31, 2004.

On the defendant's financial affidavit dated January 21, 2008, he reflects the aggregate value of his investments in closely held businesses to be $408,000, part of his total gross assets valued at $1,026,947.74. In addition to his financial affidavit, the defendant produced evidence bearing on the fair market value of his stock in Brooks, Torrey & Scott, Inc., Westfair, Inc., and Westbrook, Inc., consisting of stock buyback agreements, each one of which requires any shareholder who wishes to convey his stock to first offer it to the corporation for repurchase at book value.[6] Each agreement includes a statement expressing a mutual desire to maintain family ownership of the stock in the corporation and a shared concern that the "introduction of non-family stockholders would tend to disrupt the harmonious relationships which have traditionally existed . . . ." Although these agreements, dating back to 1993, had recently been renewed, there was no evidence that their ongoing existence and effect had any connection to the pending marital dissolution action or that they were based on any factor other than the shareholders' mutual business judgments regarding the best interests of the involved corporations and their desire that the Brooks family continue to own and operate them.

---

[6] Although the buyback agreements of only three of the entities were introduced into evidence, it is noteworthy that the aggregate value of the real estate of those three properties is in excess of $40 million.

In formulating its financial orders, the court determined that, based on its consideration of all of the statutory factors, "neither lifetime nor any very extended alimony is warranted." The court awarded the plaintiff, as unallocated alimony and child support, the sum of $6000 per month for a period of time not to exceed eight years, with the amount and duration not subject to modification except upon remarriage or pursuant to General Statutes § 46b-82 (b). The court also awarded the plaintiff, as lump sum alimony, the sum of $1,730,446, due and payable within sixty days from the date of judgment. The court's lump sum alimony order was based on the court's finding of the value of real estate and cash held by the six limited liability corporations in which the defendant had minority stock interests and the percentage of his interest in each entity.[7] The court then ordered that the husband pay to the wife an amount equal to 15 percent of that aggregate amount.[8] Both the plaintiff and the defendant

[7] In formulating its order, the court credited Wellspeak's testimony as to the value of the real estate as of January 1, 2008, and the cash and other assets and debts of each corporation as of December 31, 2006. From this information, and aware of the percentage of stock owned by the defendant in each corporation, the court made a calculation of the value of the defendant's ownership interests by multiplying his percentage interest in each corporation by the value of each corporation. Through this process, the court calculated the fair market value of Westfair, Inc., to be $19,497,610, and then multiplied that value by the defendant's share in the corporation, 23.33 percent, to come up with $4,548,792.41 as the value of the defendant's interest in that company. In the same manner, the court determined the defendant's interests in the remaining entities as follows: Westbrook, Inc., $5,013,330.52; Brooks, Torrey & Scott, Inc., $717,977.60; Liberty Rock Realty, LLC, $680,400; Milford Realty Corporation, $70,907.24; and Granite National Realty, LLC, $504,900.

[8] In its memorandum of decision, the court stated: "The division shall be based on the appraisal and six schedules set forth by the wife." Later, pursuant to a motion for articulation, the court issued a "supplement" to its judgment, in which it stated: "The above captioned judgment dated May 27, 2008 (page 5, line 11) is supplemented by including a list of the schedules referenced therein by the attached list marked 'Exhibit B.'" Exhibit B is comprised of a listing of the entities in which the defendant has an interest. Next to each entity is a valuation that is based on Wellspeak's real estate

sought reconsideration of the court's decision, which was denied, and the defendant timely filed this appeal challenging only the court's lump sum alimony award.

As a threshold matter, we set forth our standard of review. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . In reviewing the trial court's decision under [the abuse of discretion] standard, we are cognizant that [t]he issues involving financial orders are entirely interwoven. The rendering of judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other." (Internal quotation marks omitted.) *Gervais* v. *Gervais*, 91 Conn. App. 840, 843–44, 882 A.2d 731, cert. denied, 276 Conn. 919, 888 A.2d 88 (2005).

"In distributing the assets of the marital estate, the court is required by [General Statutes] § 46b-81 to consider the estate of each of the parties. Implicit in this requirement is the need to consider the economic value of the parties' estates. The court need not, however, assign specific values to the parties' assets. . . . In assessing the value of the assets that comprise the marital estate, the trial court functions as the trier of fact.

appraisal of each property, less the mortgage indebtedness regarding each property plus the value of the cash in each corporation. Although the dates of valuation of real estate, cash in the corporations and mortgage indebtedness are different, the defendant makes no distinct claim that combining them for purposes of ascertaining the value of each corporation was erroneous. Rather, the defendant claims that the court erroneously determined that the value of his stock interest in each corporation could reasonably be determined by this method.

The trial court has the right to accept so much of the testimony . . . as [it] finds applicable . . . . [It] arrives at [its] own conclusions by weighing the opinions of the appraisers, the claims of the parties, and [its] own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . In selecting and applying an appropriate valuation method, the trial court has considerable discretion. . . . The trial court's findings will be overturned only if it misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard." (Citations omitted; internal quotation marks omitted.) *Bornemann* v. *Bornemann*, 245 Conn. 508, 531–32, 752 A.2d 978 (1998).

At the outset of our analysis, we note that, as a general proposition, "the trial court need not necessarily specify a valuation method used. Nor is the court required to set forth specific factors that were considered in arriving at that determination." *South Farms Associates Ltd. Partnership* v. *Burns*, 35 Conn. App. 9, 18, 644 A.2d 940, cert. denied, 231 Conn. 912, 648 A.2d 157 (1994). Here, however, the court indicated that it was employing the fair market approach to valuation, an approach with which the defendant took no issue. The question, therefore, is not whether the court utilized a correct approach to valuation, but whether the court's analysis in using the fair market approach was clearly erroneous. In this regard, the defendant contends that the court improperly equated the value of his interests in the companies with the fair market value of the real estate held by those companies. The defendant claims, as well, that, in determining the value of his interests in the corporations, the court ignored three critical factors, namely: the lack of a ready market for closely held interests; his lack of control of the business entities;

and the restrictions on his ability to transfer his shares as evidenced by the buyback agreements pertaining to three of the businesses. We agree.

An assessment of fair market value requires the fact finder to determine "the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account all the factors, including the highest and best or most advantageous use, weighing and evaluating the circumstances, the evidence, the opinions expressed by the witnesses and considering the use to which the premises have been devoted and which may have enhanced its value." (Internal quotation marks omitted.) *Commissioner of Transportation* v. *Towpath Associates*, 255 Conn. 529, 556–57, 767 A.2d 1169 (2001). Our case law instructs us to be broadly inclusive when considering the admissibility of factors that reasonably might influence a property's fair market value. See *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partnership*, 272 Conn. 14, 32, 861 A.2d 473 (2004). "Fair market value . . . involves a question of fact. . . . As with other questions of fact, unless the determination by the trial court is clearly erroneous, it must stand." (Citations omitted.) *Turgeon* v. *Turgeon*, 190 Conn. 269, 275–76, 460 A.2d 1260 (1983).

Here, the record reflects that the court made no assessment of the marketability of the defendant's interest in any of the corporations in which he has a minority interest. Rather, the court expressly arrived at its determination simply by multiplying the value of each corporation by the percentage of the defendant's interest and positing the result as the fair market value of his shareholdings. Although the court has leeway in determining the value of assets in a marital dissolution, a market value approach to valuation, nevertheless, necessarily requires an examination of the marketability of the asset being appraised. Accordingly, in determining the fair market value of the defendant's

stock interests, the court was required to examine and draw some conclusions regarding the amount a willing buyer would and could pay for the defendant's shares in the various family companies.[9] The record in this instance reflects that the court made no attempt to conduct such an analysis and rejected the notion that the defendant's interests were limited to book value simply on the basis that to do so would "simply not do justice." Nevertheless, evidence adduced at trial shows that the defendant had only minority interests in each of the six entities and the buyback agreements of three of those entities restrict the owner of the stock from selling, assigning or in any way transferring that stock without first offering it to the company to be bought back at book value. In its decision, the court made no mention of the marketability of the defendant's shares or the degree of control he maintains by virtue of his minority interests in the companies. Nor did the court note the restrictions on the defendant's ability to transfer his interests. Thus, although the court was within its discretion to apply the market value approach in valuing the defendant's interest in the various compa-

---

[9] Internal Revenue Service ruling 59-60, which was cited by the *Turgeon* court, provides guidelines for ascertaining the fair market value of closely held corporations. Under Revenue Ruling 59-60, "[t]he following factors, although not all-inclusive are fundamental and require careful analysis in each case [in determining fair market value of a closely held corporation]:

"(a) The nature of the business and the history of the enterprise from its inception.

"(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

"(c) The book value of the stock and the financial condition of the business.

"(d) The earning capacity of the company.

"(e) The dividend-paying capacity.

"(f) Whether or not the enterprise has goodwill or other intangible value.

"(g) Sales of the stock and the size of the block of stock to be valued.

"(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter." Revenue Ruling 59-60 § 4 (26 C.F.R. § 20.2031-2).

nies, the court's flawed analysis resulted in clearly erroneous valuations.[10]

In reaching our conclusion, we recognize that when a party neglects to provide to the court information regarding the value of his or her assets, that person cannot later complain about the court's valuation. See *Bornemann* v. *Bornemann*, supra, 245 Conn. 535–36. But that teaching is not implicated in this case. Here, the defendant provided the court with three shareholder agreements that require him to sell his stock back to the respective corporations at book value. Importantly, there was no evidence that those agreements were executed for purposes of the divorce proceedings or that they were otherwise the product of collusion or fraud on the plaintiff. Rather, the evidence regarding these agreements showed that they were simply long-standing business arrangements meant to keep the businesses

---

[10] We recognize that, in a marital dissolution action, the court is not required to value every asset. See *Bornemann* v. *Bornemann*, supra, 245 Conn. 531. Our Supreme Court, however, has noted that "although not expressly required by statute, a trial court, when utilizing a method to ascertain the value of a [deferred benefit], should reach that value on the record. Casting the judgment in specific amounts will make the result more comprehensible for the litigants and will facilitate appellate review as often as such review may become necessary." (Internal quotation marks omitted.) *Krafick* v. *Krafick*, 234 Conn. 783, 804, 663 A.2d 365 (1995). Here, the court did reach conclusions regarding the value of the defendant's business interests. Because the court did ascribe values to the defendant's shares in each of the six entities, decisional law suggesting that the court need not posit such values is not an aid to our review.

We note, as well, that the court could have fashioned its orders on many other relevant factors such as the evidence that the defendant had received past disbursements from his business interests, that there was some history of loans from corporation to corporation or the defendant's residuary interest in a trust in which he had already received an advance and about which the court heard valuation testimony. But, because the court expressly based its order on its evaluation of the market value of the defendant's shareholdings, we cannot rely on any of these alternate routes to an alimony order to uphold the order entered in this instance. In short, where the court has expressly stated the manner in which it arrived at its orders and the record reflects that the court's analysis was flawed, the judgment may not be saved by reference to alternate analyses the court could have employed, but clearly did not.

in family hands. Additionally, throughout the plaintiff's presentation of evidence, the defendant vigorously objected to the plaintiff's introduction of the appraisals of the real estate as evidence of the value of his shares in the businesses pointing out to the court that the value of real estate held by the corporations could not simply be equated with the value of each corporation and that the defendant's interest in each corporation could not be determined simply by employing a mathematical formula.[11] Indeed, at the outset of his testimony, Wellspeak, the plaintiff's real estate appraiser, stated that he was not attempting to value the defendant's stock interest, commenting instead that he was performing merely the initial step in the valuation and that there would have to be more analysis to determine the value of the defendant's minority share interest.[12] Before the close of the plaintiff's case, the defendant again brought to the court's attention his view that the plaintiff had not established evidence of the value of his shareholdings and indicated that he was not going to present his expert on valuation because, he believed, the plaintiff had presented no valuation testimony for him to rebut. Upon hearing this, and in response to the plaintiff's concerns that the defendant was not going to present valuation testimony beyond the terms of the buyback agreements, the court offered the plaintiff a reasonable opportunity to call the defendant's rebuttal witness herself at a later date in order to put on evidence of the value of the defendant's minority interests. From the record, it is plain that the plaintiff never took that opportunity.

---

[11] Indeed, the record reflects the court's awareness of this deficiency in the plaintiff's proof.

[12] In fact, the plaintiff did not contend that she had established valuation of the defendant's interests. She introduced real estate values, then financial statements to show mortgages and extra cash and then multiplied by the defendant's percentage interest. The plaintiff never claimed this was a proper valuation but invited the court to make a just award. The plaintiff never said the court could arrive at a value by this mathematic formula but the court patently did so.

Although the court has a broad latitude in determining both the method of asset evaluation to employ and the manner in which the court conducts its evaluation, the court is, nevertheless, required to follow some reasonable path in arriving at its asset value determination. Where, as here, the court employs a patently erroneous methodology, its results cannot stand. On the basis of the foregoing, we conclude that the court's asset valuation was clearly erroneous and therefore, its lump sum alimony award was an abuse of discretion. As noted previously, financial orders in dissolution proceedings have been characterized as "resembling a mosaic, in which all the various financial components are carefully interwoven with one another." (Internal quotation marks omitted.) *Finan* v. *Finan*, 287 Conn. 491, 509, 949 A.2d 468 (2008). Because it is uncertain whether the court's financial awards will remain intact after reconsidering the issue of its lump sum alimony award consistent with this opinion today, the entirety of the mosaic must be refashioned. See *Gershman* v. *Gershman*, 286 Conn. 341, 351–52, 943 A.2d 1091 (2008). Accordingly, a new trial on all financial issues is required. See id., 352.

The judgment is reversed only as to the financial orders and the case is remanded for a new trial on the financial issues.

In this opinion the other judges concurred.