# SANDY D. MCRAE *v.* SCOTT A. MCRAE
## (AC 31842)

Gruendel, Beach and Robinson, Js.

Argued January 7—officially released May 31, 2011

*Campbell D. Barrett*, with whom was *Jon T. Kukucka*, for the appellant (defendant).

*Matthew J. O'Keefe*, with whom was *Joseph M. Busher, Jr.*, for the appellee (plaintiff).

*Opinion*

ROBINSON, J. The defendant in this marital dissolution matter, Scott A. McRae, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Sandy D. McRae, and entering related financial orders. On appeal, the defendant claims that the court improperly (1) assessed the value of his business and (2) awarded the plaintiff the cash equivalent of one-half of the value of his business in addition to alimony generated solely by that business. We affirm the judgment of the trial court.

Our review of the record reveals the following relevant facts and procedural history. The plaintiff and the defendant were married on September 2, 1989, in Mystic, and they are the parents of two daughters. At the time of the dissolution, the plaintiff was forty-seven years old and the defendant was fifty-one years old. The plaintiff was the sole owner of Distinctive Finishes, LLC, a decorative painting business, and the principal caregiver of the parties' two children. Her income was derived principally from her work as a decorative painter with her business and from substantial gifts from her family. The defendant was the sole owner and shareholder of Creative Change, Inc. (Creative), a business that creates software programs for use by

hospitals and physicians. Although he assisted the plaintiff with starting her business, the defendant derived his income solely from his work with Creative.

The plaintiff commenced this marital dissolution action by complaint filed May 31, 2007, in which she alleged that the marriage had broken down irretrievably. In the complaint, she requested, inter alia, that the court issue a decree dissolving the marriage, award her alimony and undertake an equitable division of the parties' marital property.

The dissolution trial took place over eight days in January, March and April, 2009. During the trial, the main issue of contention concerned the value of Creative, and both parties presented extensive evidence on this issue, including expert testimony. The plaintiff offered the testimony of Joseph A. DeCusati, a certified public accountant and business valuation analyst. According to DeCusati, the estimated fair market value of Creative, as of December 16, 2008, was $376,968. DeCusati testified that he utilized the net asset approach in formulating his valuation.[1] In response, the defendant offered the testimony of John Kramer, a certified public accountant. Kramer testified that he had utilized the same methodology as did DeCusati, but he opined that, as of December 31, 2008, Creative had a fair market value of $56,000. The court admitted into evidence Kramer's valuation report, which explained in detail the calculations he undertook in reaching his final valuation.

---

[1] In general, under the net asset approach, the value of a business is determined by deducting the business' total liabilities from the business' total assets. See *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 329, 514 A.2d 734 (1986) (noting that "net asset value . . . [is defined as] the present sale price of the business assets less its liabilities"); 2 Valuation and Distribution of Marital Property (M. Bender ed., 2010) § 22.08 [2], p. 22-91 (noting that under net asset approach, "value is assets minus liabilities").

On October 5, 2009, ruling orally, the court concluded that the marriage had broken down irretrievably and that both parties were "either to blame or blameless for the breakdown of the marriage." Accordingly, the court rendered judgment dissolving the marriage. Thereafter, the court proceeded to make factual findings and enter financial orders that form the basis of the present appeal.

On the basis of the evidence adduced during the trial, the court found that the plaintiff had an earning capacity of $50,000 per year and that the defendant had a present earning capacity of $100,000 per year.[2] In accordance with these findings, and after considering the criteria set forth in General Statutes § 46b-82,[3] the court ordered the defendant to pay periodic alimony to the plaintiff for ten years, in the amount of $500 per week for the first three years and $250 per week for the remaining seven years.[4] In addition, pursuant to General Statutes § 46b-62,[5] the court awarded the plaintiff $15,000 in

[2] As to the defendant's present earning capacity, the record indicates that the court did not base its finding entirely on the work he performed with Creative. Instead, the court concluded that he had a good prospect for employability if he should ever leave his company.

[3] General Statutes § 46b-82 (a) provides in relevant part: "In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall hear the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment."

[4] These alimony payments were not subject to modification as to term but were ordered to terminate upon the death of either party or remarriage of the plaintiff.

[5] Concerning family relations matters, General Statutes § 46b-62 provides in relevant part that "the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

attorney's fees and ordered that the fees be taken from $315,338 that was being held in escrow.[6]

As to the marital property, after considering the criteria set forth in General Statutes § 46b-81,[7] the court found that the plaintiff's business had a value of $2500 and that Creative, "for the purposes of property distribution," had a value of $144,000.[8] The court explained that in reaching its valuation of Creative, it had taken the valuation offered by Kramer, rounded to the nearest thousand dollar, and then added to it $88,000, the approximate value of an undeposited check issued by Middlesex Hospital to Creative (hospital check). According to the court, it believed that the hospital check belonged in Kramer's valuation.

The court also stated that, setting aside the alimony order and the award of attorney's fees, its intention was to divide the marital property equally so that each party would receive assets valuing approximately $340,367. To effectuate this intention, the court first permitted

[6] It is undisputed that the proceeds being held in escrow came from the sale of the marital residence, which had been sold during the pendency of the dissolution proceeding.

[7] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either the husband or wife all or any part of the estate of the other. . . .

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[8] The court initially indicated that, although the plaintiff testified that her business was worth $2500, "[n]o one obtained a valuation for the business, and it might not have any value." The court later found that the plaintiff's business had a value of $2500. The defendant has not challenged this finding on appeal.

each party to keep his or her own business, business bank accounts, stocks, bonds, mutual funds and cars.[9] Thereafter, to compensate for the perceived inequality that resulted from this initial division, which was largely due to the $144,000 value placed on the defendant's business, the court awarded the plaintiff $254,585 out of the proceeds being held in escrow.[10] The defendant was awarded the remaining $60,753.

On April 22, 2010, the defendant filed a motion for articulation, in which he requested, inter alia, that the court articulate the complete factual basis for concluding that Creative was worth $144,000 and for awarding the plaintiff $254,585 out of the escrow funds. Furthermore, the defendant requested that the court articulate the legal basis for awarding the plaintiff periodic alimony in addition to purportedly awarding her the cash value of one-half of his business. The court denied the motion. On April 28, 2010, the defendant filed with this court a motion for review of the trial court's denial of his motion for articulation. This court granted the motion for review but denied the relief requested therein. This appeal followed. Additional facts will be set forth as necessary.

Before considering the defendant's claims, we first set forth the legal principles and applicable standard of review that guide our resolution of these claims. "A fundamental principle in dissolution actions is that a trial court may exercise broad discretion in awarding alimony and dividing property as long as it considers all relevant statutory criteria. . . . An appellate court

[9] The court also ordered that the total value of the parties' individual retirement accounts were to be divided equally by giving the plaintiff $21,274 by way of a qualified domestic relations order.

[10] The court's award of $254,585 to the plaintiff appears to have included the $15,000 it awarded to her in attorney's fees, which was to be taken out of those funds.

will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . This standard of review reflects the sound policy that the trial court has the opportunity to view the parties first hand and is therefore in the best position to assess all of the circumstances surrounding a dissolution action, in which such personal factors such as the demeanor and the attitude of the parties are so significant." (Internal quotation marks omitted.) *Kaczynski* v. *Kaczynski*, 124 Conn. App. 204, 209, 3 A.3d 1034 (2010).

"An appellant who seeks to reverse the trial court's exercise of judicial discretion assumes a heavy burden. . . . Decision making in family cases requires flexible, individualized adjudication of the particular facts of each case. . . . Trial courts have a distinct advantage over an appellate court in dealing with domestic relations, where all of the surrounding circumstances and the appearance and attitude of the parties are so significant. . . . Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference." (Internal quotation marks omitted.) *Campbell* v. *Campbell*, 120 Conn. App. 760, 766–67, 993 A.2d 984 (2010).

I

First, the defendant claims that the court improperly assessed the value of his business. Specifically, the defendant argues that the court erroneously added the approximate value of the previously mentioned hospital check to Kramer's valuation because the evidence

established that the hospital check represented a prepayment for future services and, therefore, had not been earned by Creative. In the alternative, the defendant argues that, even assuming that the hospital check had been earned, it was an abuse of discretion for the court to add the full approximate value of the hospital check to Kramer's valuation because (1) Kramer testified that he had already included a portion of the $88,000 in his final valuation and (2) Creative would have incurred expenses in performing the work for which the hospital check had been issued. For the reasons we will set forth, we conclude that the trial court did not value Creative improperly.

A

We first consider the defendant's argument that the court erroneously added the approximate value of the hospital check to Kramer's valuation because the evidence established that the hospital check represented a prepayment for future services. In essence, the defendant contends that the court's factual finding that the hospital check had been earned by Creative is clearly erroneous. We disagree.

In or about July, 2007, Creative entered into a contract with Middlesex Hospital (hospital contract) for the installation of a patient registration scanning system (system).[11] The hospital contract provided that Creative would install the system by the end of October, 2008, and that Middlesex Hospital would make various progress payments throughout the installation process. By invoice dated September 17, 2008, Creative billed Middlesex Hospital in the amount of $88,185 for certain hardware and software, including its installation (hospital invoice). On or about October 10, 2008, Middlesex Hospital issued the hospital check to Creative in the amount of $88,185.

---

[11] The estimated total cost of the project was $117,935.

Sreedhar K. Poetti, the manager of financial applications for Middlesex Hospital, testified that he had received the invoice from Creative and that it related to the system. According to Poetti, the hospital contract required Middlesex Hospital to make progress payments to Creative as it acquired materials for installation of the system and that these payments were due within thirty days of request. He also testified that the hardware and software detailed in the hospital invoice had been delivered and installed during the last week of October, 2008.

During cross-examination, Poetti admitted that he had requested that Creative submit an invoice prior to September 30, 2008. According to Poetti, this was done so that Middlesex Hospital could incur as much of the expenses related to the system as possible before the end of its fiscal year. He also stated that the hospital check had included payment for future work, but he did not specify what this work entailed or when this work was completed. He did testify, however, that Creative had installed the system fully, and thus completed the contract, some time prior to April 24, 2009.

Steven McDowell, the purchasing manager for Middlesex Hospital, who was in charge of accounts payable, testified that although he did not know whether the hospital check represented the final payment under the hospital contract, he believed that it had been issued as a payment for services performed, as opposed to future services. In addition, he testified that although he did not know whether the work called for under the hospital contract had been completed, Middlesex Hospital "wouldn't have issued the check" unless the work had been completed. According to McDowell, it would be "unusual" for Middlesex Hospital to issue a check for work not yet performed and then ask the recipient to refrain from using the funds until completion of the work.

During his testimony, the defendant admitted that he had received the hospital check shortly after October 10, 2008, but stated that he had not deposited it into any of Creative's bank accounts.[12] According to the defendant, he believed that the hospital check represented a prepayment for uncompleted work and, therefore, he could not include it in his business bank accounts until it had been earned.

On appeal, the defendant challenges the factual finding that the hospital check had been earned by Creative. "Our review of the trial court's factual findings is limited to the question of whether the findings are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Waterview Site Services, Inc.* v. *Pay Day, Inc.*, 125 Conn. App. 561, 566–67, 11 A.3d 692 (2010), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011).

"It should be reiterated that the weight to be given the evidence and the credibility of the witnesses are within the sole province of the trial court. . . . The trial court has the unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us." (Citation omitted; internal quotation marks omitted.) *Stearns* v. *Stearns*, 4 Conn. App. 323, 327, 494 A.2d 595 (1985). "Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings,

---

[12] The record indicates that at the time of the dissolution hearing, the defendant was still in possession of the hospital check and it had still not been deposited.

[w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Ackerman* v. *Sobol Family Partnership, LLP,* 298 Conn. 495, 508, 4 A.3d 288 (2010).

In the present case, there is sufficient evidence in the record to support the trial court's finding that the hospital check had been earned. During his testimony, Poetti explained that the hospital check had been issued for certain hardware and software that Creative had acquired for installation of the system, and that the hospital contract required Middlesex Hospital to pay Creative when it acquired this material. Additionally, McDowell testified that it would have been highly unusual for Middlesex Hospital to issue a check for payment unless the work for which it had been issued was completed. On the basis of this testimony, the court reasonably could have concluded that the check had been earned at the time it was issued by Middlesex Hospital.

In opposition to this conclusion, the defendant argues that Poetti's testimony during cross-examination establishes that Creative "received an $88,000 advance payment from Middlesex Hospital in 2008 for work that was not completed until 2009." Even if we were to assume that the work had not been completed until 2009, Poetti testified that all of the work called for under the hospital contract had been completed no later than April 24, 2009. As our Supreme Court has recognized, the "date of the granting of the divorce would be the proper time as of which to determine the value of the estate of the parties upon which to base the division of property." (Internal quotation marks omitted.) *Sunbury* v. *Sunbury,* 216 Conn. 673, 676, 583 A.2d 636 (1990); see also General Statutes § 46b-81.

Therefore, the court reasonably could have concluded that the hospital check represented a prepayment when it was issued but had been earned once the contract was completed, which was before the date of dissolution. Accordingly, we conclude that the trial court's factual finding that the hospital check had been earned by Creative was not clearly erroneous.

B

We next consider the defendant's alternative argument that, even assuming that the hospital check had been earned, it was an abuse of discretion for the court to add the full approximate value of the hospital check to Kramer's valuation because (1) Kramer testified that he had already included a portion of the $88,000 in his final valuation and (2) Creative would have incurred expenses in performing the work for which the hospital check had been issued. For these two reasons, the defendant argues that the court's method of valuing Creative constitutes a " 'patently erroneous methodology'," requiring us to reverse the trial court's decision pursuant to this court's decision in *Brooks* v. *Brooks*, 121 Conn. App. 659, 997 A.2d 504 (2010). We are not persuaded.

At the dissolution trial, Kramer testified at length regarding his valuation report and how he had calculated his final valuation of Creative. According to Kramer, he had concluded that the hospital check was a prepayment after reviewing information in Creative's financial records. Because he regarded the hospital check as a prepayment, Kramer explained that he had accounted for it on both the asset side and the liability side of his valuation report, so as to avoid an overvaluation. More specifically, Kramer stated that he had included the value of the hospital check in his valuation report as an account receivable (an asset) and a deferred revenue (a liability). As a result of doing so,

the asset and the liability offset fully, resulting in the hospital check adding no value to Creative. Kramer admitted, however, that if the hospital check represented a payment for completed work, and thus had been earned, it should not have been included in his calculation as a deferred revenue.

In addition, Kramer testified that the defendant had informed him that Creative had incurred approximately $37,000 in costs related to purchases of hardware for future jobs, including the hospital contract. On the basis of this information, Kramer stated that he had included these costs in his valuation report as an asset (cost asset) because they represented amounts that "have actually been paid in relation to those [jobs]."[13] According to Kramer, because some of these costs had been incurred in connection with the hospital contract, a portion of the deferred revenue associated with the hospital check had been removed from the business' liabilities and made a cost asset. Kramer did not explain what amount or percentage of the hospital check's deferred revenue had been included as a cost asset in his valuation.

"Section 46b-81 governs the distribution of assets in dissolution actions." *DiCerto* v. *Jones*, 108 Conn. App. 184, 192, 947 A.2d 409 (2008); see also *Krafick* v. *Krafick*, 234 Conn. 783, 792, 663 A.2d 365 (1995); General Statutes § 46b-81. "In distributing the assets of the marital estate, the court is required by § 46b-81 to consider the estate of each of the parties. Implicit in this requirement is the need to consider the economic value of the parties' estates. . . . In assessing the value of the assets that comprise the marital estate, the trial court functions as the trier of fact." (Citations omitted.)

---

[13] As a current asset of the business, under the net asset approach, the cost assets would have increased the business' value because they would not have an offsetting liability.

*Bornemann* v. *Bornemann*, 245 Conn. 508, 531, 752 A.2d 978 (1998).

"[T]he trier [of fact] arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation. . . . The trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as he finds applicable; his determination is reviewable only if he misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was his duty to regard." (Citations omitted; internal quotation marks omitted.) *Stearns* v. *Stearns*, supra, 4 Conn. App. 328; see also *Bornemann* v. *Bornemann*, supra, 245 Conn. 531–32; *Brooks* v. *Brooks*, supra, 121 Conn. App. 666–67.

Turning to the defendant's claim, Kramer testified that if the hospital check had been issued for completed work, it should not have been included as a deferred revenue in his valuation report. Therefore, after concluding that the hospital check had been earned, the court was permitted to conclude that the value of the hospital check should be removed from the deferred revenue of Kramer's valuation report. As a result, under Kramer's formulation, the value of the hospital check would be counted as an asset only, without an offsetting liability, thereby increasing the value of Creative to that extent.

The defendant nevertheless argues that it was improper for the court to add all of the full approximate value of the hospital check to Kramer's valuation because Kramer had testified that he had already included a portion of the hospital check's deferred revenue in his valuation as a cost asset. According to the defendant, because the cost assets did not have an

offsetting liability, the court's addition of $88,000 produced an overvaluation of Creative to the extent that Kramer had included a portion of the hospital check's deferred revenue as a cost asset.

The defendant's argument, however, ignores that "the trial court is the sole arbiter of witness credibility, [and] it has discretion to reject even uncontested evidence." *Blum* v. *Blum*, 109 Conn. App. 316, 329, 951 A.2d 587, cert. denied, 289 Conn. 929, 958 A.2d 157 (2008); see *Stewart* v. *King*, 121 Conn. App. 64, 74, 994 A.2d 308 (2010) ("[t]he court . . . [is] free to discredit even uncontroverted testimony"). As the sole arbiter of credibility, the trial court was free to reject Kramer's testimony and conclude that none of the costs assets were attributable to the hospital contract. Having rejected this testimony, the court reasonably could have determined that the full approximate value of the hospital check should be included in the valuation of Creative.[14]

In addition, the defendant argues that the court erred in its valuation because it failed to consider "the wages that Creative . . . would have had to pay its programmers in order to earn the $88,000 sum, and the materials that Creative . . . required to complete the work and any other overhead costs that were necessary to maintain the business as a going viable entity." In his brief on appeal, however, the defendant has cited to nothing

[14] In addition, even if the court had accepted Kramer's testimony, we could not conclude that the court committed error. As the defendant conceded during oral argument before this court, the record is not clear regarding how much of the approximately $37,000 in costs were attributable to the hospital contract. Consequently, without some evidence that identified the costs associated with the hospital contract, the court had no way of determining how much of the costs related to the hospital contract or, consequently, what amount of the deferred revenue associated with the hospital check had been converted into a cost asset. For that reason, we could not conclude that the court, in reaching its valuation, misapplied, overlooked or gave improper effect to a consideration that it had a duty to regard. *Stearns* v. *Stearns*, supra, 4 Conn. App. 328.

in the record to indicate that evidence was produced regarding the amount of these claimed expenses. After a careful review of the record, we also have been unable to find any evidence suggesting the amount of these claimed expenses.[15] Without some evidence regarding these expenses, the court had no way of determining what these expenses included or how much these expenses totaled. Having failed to adduce at least some evidence, the defendant cannot now claim on appeal that the trial court committed error in failing to consider these expenses in formulating its valuation. See *Bornemann* v. *Bornemann*, supra, 245 Conn. 535 ("when neither party in a dissolution proceeding chooses to introduce detailed information as to the value of a given asset, neither party may later complain that it is not satisfied with the court's valuation of that asset"). In light of the absence of evidence, we cannot say that the court, in reaching its valuation, misapplied, overlooked or gave improper effect to a consideration that it had a duty to regard. *Stearns* v. *Stearns*, supra, 4 Conn. App. 328.

On the basis of these conclusions, we further conclude that the defendant's reliance on *Brooks*, and particularly the patently erroneous methodology language, is misplaced. In *Brooks*, this court concluded that it was clearly erroneous for the trial court to *ignore* "three critical factors" in determining the value of the defendant's interests in six closely held entities.[16] *Brooks* v.

---

[15] We note that although some general testimony was offered regarding the salaries and hourly wages of Creative's employees, the evidence does not indicate which employees may have worked on the hospital contract or how many hours these employees dedicated to its completion.

[16] In determining the value of the defendant's interest, the trial court failed to take the following into consideration: "the lack of a ready market for closely held interests; [the defendant's] lack of control of the business entities; and the restrictions on [the defendant's] ability to transfer his shares as evidenced by the buyback agreements pertaining to three of the businesses." *Brooks* v. *Brooks*, supra, 121 Conn. App. 667–68.

*Brooks,* supra, 121 Conn. App. 667. Because the trial court failed to take these factors into consideration, this court held that the trial court "employ[ed] a patently erroneous methodology . . . ." Id., 672.

In the present case, as we have already discussed, the trial court did not ignore, or fail to take into account, any consideration that it had a duty to regard in formulating its valuation of the defendant's business. Therefore, we are persuaded that the trial court followed a reasonable path in assessing the value of Creative. See id. Accordingly, we conclude that the trial court did not abuse its discretion in assessing the value of the defendant's business.

## II

Next, the defendant claims that the court improperly awarded the plaintiff the cash equivalent of one-half of the value of his business in addition to alimony generated solely by that business. We are not persuaded.

First, the defendant argues that "after awarding a spouse a percentage of the value of the other spouse's closely held business, a court cannot award alimony to the recipient spouse that is derived from income generated by the remaining capital of the business." Our alimony statute expressly provides that "[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider . . . the award, if any, which the court may make pursuant to section 46b-81 . . . ." General Statutes § 46b-82 (a). While the plain language of this statute *permits* a trial court to consider the award, if any, that it has made under § 46b-81, nothing in the statutory language *forbids* a court from awarding periodic alimony to one spouse when the court has made an equitable distribution of the other spouse's closely held business pursuant to § 46b-81.[17]

[17] We also are not persuaded that the cases cited by the defendant in support of this argument stand for the broad proposition that he advances.

Second, the defendant argues that "the trial court's decision to take into account [his] business in both the property division and the award of alimony constitutes improper 'double dipping.' " The defendant's argument, however, misconstrues the basis for the court's alimony order. In its oral decision, the court provided that its order was based on the earning capacity that the court ascribed to the plaintiff and the defendant. Because earning capacity is a permissible ground on which to base an alimony order; see *Wolf* v. *Wolf*, 39 Conn. App. 162, 169, 664 A.2d 315 (1995); *Hart* v. *Hart*, 19 Conn. App. 91, 94, 561 A.2d 151, cert. denied, 212 Conn. 813, 565 A.2d 535 (1989); the court was permitted to award alimony to the plaintiff based on this consideration. The defendant has pointed to nothing in the record indicating that the court based its alimony order on his business. Furthermore, as the defendant has not challenged the court's factual finding as to his earning capacity, we do not address the issue. Accordingly, we conclude that the trial court did not abuse its discretion in awarding periodic alimony to the plaintiff under the facts of the present case.

The judgment is affirmed.

In this opinion the other judges concurred.