******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARY TIRRENO *v.* THE HARTFORD
(AC 36879)

Beach, Alvord and Pellegrino, Js.

*Argued October 7—officially released December 15, 2015*

(Appeal from Superior Court, judicial district of
Fairfield, Hon. Richard P. Gilardi, judge trial referee.)

*Sandra J. Akoury*, for the appellant (plaintiff).

*Meg R. Reid*, with whom, on the brief, was *Daniel
P. Scapellati*, for the appellees (defendants).

*Opinion*

ALVORD, J. The plaintiff, Mary Tirreno, appeals from the trial court's judgment in favor of the defendants, The Hartford Financial Services Group, Inc., and its wholly-owned subsidiary, Trumbull Insurance Company (collectively, The Hartford).[1] On appeal, Tirreno claims that the court erred by granting The Hartford's motion to enforce a settlement agreement negotiated by her prior counsel.[2] Specifically, Tirreno claims that the court improperly failed to conclude that she "lacked the mental capacity to enter into an agreement of binding mediation or binding arbitration." In the alternative, if the agreement is valid, she claims that the parties agreed to settle their dispute through arbitration, but they failed to reduce their agreement to writing and, therefore, under General Statutes § 52-408 the arbitrator's award cannot be confirmed. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. Tirreno alleged injuries from a motor vehicle accident on September 27, 2010. Tirreno sought underinsured motorist benefits from her insurer, The Hartford. Unable to reach a resolution of her insurance claim, Tirreno filed a breach of contract complaint against The Hartford in March, 2012. Tirreno also sought punitive damages, claiming that The Hartford was not abiding by the terms of her policy and was thus violating the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and the Connecticut Unfair Insurance Practices Act, General Statutes § 38a-815 et seq.

On April 24, 2013, The Hartford's counsel sent a letter to Tirreno's counsel proposing to resolve the claim through mediation. Following a pretrial conference on April 25 and through a series of e-mails, the attorneys negotiated the terms of a binding mediation. The parties agreed that Tirreno would withdraw all extracontractual claims and The Hartford would permit Tirreno to argue for damages in excess of its policy limits. The parties selected a mediator and agreed that they would work with the mediator to reach a settlement. If they could not reach a settlement of their dispute in this manner, the mediator would decide the claim and determine damages. On April 29, 2013, the parties initially agreed that they would accept the mediator's decision as final and they confirmed that they would use this method of adjudication just prior to beginning the mediation session. These terms were agreed to orally, memorialized in a series of e-mails exchanged between counsel, and later testified to by counsel.[3]

On June 18, 2013, the parties, including Tirreno and her husband, attended the mediation. Tirreno participated in the mediation proceedings by presenting evidence of the injuries that she claimed were caused by

the 2010 motor vehicle accident. Neither Tirreno nor her attorney raised any issues concerning her mental capacity and her ability to participate in the mediation. Ultimately, the parties failed to reach a settlement, thus requiring the mediator to adjudicate their dispute.

On July 11, 2013, the mediator, in a written decision summarizing the mediation evidence, awarded Tirreno $75,000 in net damages. In response, The Hartford issued a check for that amount, and on July 23, the check was sent to Tirreno's counsel. After several weeks elapsed with the check not having been cashed, The Hartford's counsel attempted to contact Tirreno's counsel. On October 14, 2013, Tirreno personally e-mailed The Hartford's counsel, stating: "Attorney Perkins no longer represents me, and has not since July 27th. I [i]nstructed Atty. Perkins to return the check as I never agreed to any settlement, as this was not in my best interest at that time as I am in need of surgery and further treatment as a result of the accident." One week later, the uncashed check was returned to The Hartford. On October 25, 2013, Tirreno's counsel filed a motion to withdraw his appearance.

On November 14, 2013, The Hartford filed a motion to enforce the settlement agreement. Represented by new counsel, Tirreno objected to the motion to enforce the agreement, arguing that she did not have the mental capacity to decide to enter into a binding settlement agreement. A hearing on the motion to enforce was held on December 10, 2013. At the hearing, Tirreno did not dispute that her prior attorney had agreed to binding mediation or that she had authorized him to do so, merely stating that she did not have the capacity to resolve her claim in this manner. Tirreno called one witness, her treating psychiatrist, R.S. Lowe, III, and she submitted as an exhibit a letter that he wrote. Dr. Lowe testified that he wrote the letter, addressed "to whom it may concern," at the request of Tirreno and her husband, in which he stated that she lacked the "decisional capacity"[4] to enter into a legal agreement for binding mediation.

On December 26, 2013, the court granted The Hartford's motion to enforce the settlement agreement. In response, Tirreno filed a motion to reargue, claiming that the settlement was actually an arbitration proceeding and as such had failed to comply with applicable statutes. On March 27, 2014, the court held a hearing on the motion to reargue. On May 7, 2014, the court affirmed its prior order granting The Hartford's motion to enforce the settlement agreement. This appeal followed.

I

Tirreno's first claim on appeal is: "The Plaintiff lacked the mental capacity to enter into an agreement of binding mediation or binding arbitration." We disagree with

her claim. The trial court properly concluded that the parties had entered into a valid settlement agreement.[5]

"A trial court has the inherent power to enforce summarily a settlement agreement as a matter of law when the terms of the agreement are clear and unambiguous. . . . [T]o the extent that the defendant[s'] claim implicates the court's factual findings, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Kidder* v. *Read*, 150 Conn. App. 720, 732–33, 93 A.3d 599 (2014).

"[I]t is hornbook law that clients generally are bound by the acts of their attorneys . . . . In the context of settlement agreements, the authority to determine whether and on what terms to settle a claim is reserved to the client *except* when the client has validly authorized the attorney to make such decisions. . . . Thus, an attorney with apparent authority may enter into a settlement agreement that is binding on the client." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 509–10, 4 A.3d 288 (2010). "Apparent authority is derived not from the acts of the agent but from the deliberate or inadvertent acts of the principal. . . . Apparent authority has two elements. First, it must appear from the acts of the principal that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority . . . . Second, the party seeking to bind the principal must have acted in good faith reliance on that appearance of authority." (Internal quotation marks omitted.) *L & V Contractors, LLC* v. *Heritage Warranty Ins. Risk Retention Group, Inc.*, 136 Conn. App. 662, 669, 47 A.3d 887 (2012).

The relationship between client and attorney is governed by our Rules of Professional Conduct. Rule 1.14 (a) states: "When a client's capacity to make or communicate adequately considered decisions in connection with a representation is impaired, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a normal client-lawyer relationship with the client." Section (b) of rule 1.14 addresses what an attorney should do if an issue of incapacity arises: "When the lawyer reasonably believes that the client is unable to make or communicate adequately considered decisions, is likely to suffer substantial physical, financial or other

harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a legal representative." There is nothing in the record before us to indicate that Tirreno's prior counsel took any action pursuant to rule 1.14.

Here, it was not the role of the trial court to determine Tirreno's mental capacity; rather, the court only needed to determine if her prior counsel had the authority to enter into a settlement agreement. There was no dispute that she was represented by counsel in April, 2013, when attorneys for the parties agreed to use binding mediation as the method of adjudication. It was also undisputed that her counsel had the authority to enter into a settlement agreement on Tirreno's behalf. Thus, Tirreno was bound to the agreement that her counsel had negotiated and accepted. See *Ackerman* v. *Sobol Family Partnership, LLP*, supra, 298 Conn. 510. Tirreno's attendance at, and participation in, the mediation validated the parties' understanding that counsel had the authority to agree to the resolution of the claim by mediation. See *L & V Contractors, LLC* v. *Heritage Warranty Ins. Risk Retention Group, Inc.*, supra, 136 Conn. App. 669. In an e-mail exchange, Tirreno's counsel advised that he needed his client's approval before agreeing to binding mediation.[6] Under the protection of the attorney-client privilege, Tirreno's counsel declined to testify about the conversations he had with his client, but when the court asked whether he would "independently agree to a binding arbitration for any of [his] clients without their permission?" Counsel answered: "No." Based on these facts, it was reasonable for The Hartford to believe that counsel was acting as an agent of Tirreno and that he had the authority to enter into a settlement agreement on behalf of his client. The Hartford relied on this authority; the company agreed to forgo application of the contractual policy limit and to accept the final damages amount awarded by the mediator in July, 2013. If there was an issue of mental capacity, as was first claimed in counsel's November, 2013 objection to the motion to enforce the settlement agreement, it was a matter between Tirreno and her prior attorney. The court properly granted The Hartford's motion to enforce the settlement agreement.

## II

In Tirreno's second claim on appeal, she argues: "There was no agreement signed between the parties to submit the matter to binding mediation or arbitration," which deprived the arbitrator of subject matter jurisdiction and, therefore, the motion to enforce was improperly granted. After authorizing her attorney to agree to binding mediation as the method of adjudicating her

dispute with her insurer, participating in the mediation proceeding, belatedly rejecting the decision that resulted from the proceeding, and finally failing to prevail before the trial court in her argument that she did not have the mental capacity to agree to binding mediation, Tirreno now represents that she was actually an unwilling participant in an arbitration proceeding.[7] She claims that § 52-408 requires that any agreement to arbitrate must be reduced to writing[8] and that her agreement with The Hartford was not. We disagree that this binding mediation process was an arbitration proceeding.

As a preliminary matter, it is important to clarify the court's ruling as to whether this was an arbitration proceeding. After receiving the motion to reargue, the trial court held a hearing to determine whether an arbitration proceeding had taken place, and if so, whether there had been compliance with the state's arbitration statutes. At the conclusion of the hearing, the court did not make a finding as to what type of dispute resolution procedure had been undertaken by these parties. Instead, the court issued a memorandum of decision which reiterated its judgment granting The Hartford's motion to enforce the settlement agreement. In its memorandum of decision, the court did not analyze whether the parties agreed to arbitration. Rather, for the sake of the argument, the court addressed whether the procedures required by the state's arbitration statutes had been satisfied, if in fact, an arbitration proceeding had occurred.

In review, we first address whether the trial court erred by not concluding that this agreed upon method of adjudication was an arbitration proceeding. "[T]he scope of [a contract's] terms are questions of fact to be determined by the trier on the basis of all the evidence . . . and are thus subject to a limited scope of review by this court." (Citation omitted; internal quotation marks omitted.) *Harry Skolnick & Sons* v. *Heyman*, 7 Conn. App. 175, 178, 508 A.2d 64, cert. denied, 200 Conn. 803, 510 A.2d 191 (1986). "[W]e are mindful that [q]uestions of fact are subject to the clearly erroneous standard of review." (Internal quotation marks omitted.) *Burns* v. *Adler*, 158 Conn. App. 766, 802, 120 A.3d 555, cert. granted on other grounds, 319 Conn. 931, 932,     A.3d     (2015). Because we conclude that the parties did not agree to arbitrate their dispute, we do not address whether the court's granting of the motion to enforce a settlement agreement also conformed with our statutory arbitration procedures.

"Although there is no particular form of words required to form an agreement to arbitrate, the intent of the parties that arbitration be the exclusive method for the settlement of disputes arising under the contract must be *clearly manifested*. This *express intent* by both parties to enter into the arbitration agreement is essen-

tial to its existence." (Emphasis in original; internal quotation marks omitted.) *Harry Skolnick & Sons* v. *Heyman*, supra, 7 Conn. App. 179.

Here, there is no indication that the parties intended that their method of adjudicating their dispute would be considered an arbitration and, thus, subject to the provisions of the arbitration statutes. Our review of the record shows that the parties did not refer to their proposed method of adjudication as arbitration. In the initial e-mail exchanges that contemplated reaching a third party assisted resolution, the counsel for The Hartford termed the undertaking a mediation, and proposed that the mediator would take on an additional responsibility of assigning a "final number" if a settlement was not reached. The only reference to arbitration was in the caption used by the mediator on his decision; he labeled it "Arbitration Award." Formal words are not required to create an agreement to arbitrate, but the lack of such words aids us in determining the intent of the parties. See id., 178.

In deciding whether the agreement manifested a clear and direct intent to arbitrate, we also consider whether the method employed by the parties to resolve this dispute resembled arbitration. Here, although the process arguably fit the general definition of arbitration in that the parties' final determination would be made by a disinterested person, the parties specifically contemplated that their resolution process would differ from statutory arbitration. In an e-mail to Tirreno's prior counsel, The Hartford's counsel stated: "It would be similar to arbitrating the case, but would not be as time-consuming and less expensive." The process here was to begin with mediation between the parties, and it would only evolve to resemble ordinary arbitration, in the sense that the mediator would assign a binding dollar amount, if the parties could not reach a facilitated agreement.[9] Before this court, Tirreno conceded that the procedures employed by the mediator did not resemble a typical arbitration proceeding with her representation that: "The problem is [that] the arbitration was not a regular arbitration in which there was evidence presented [or] expert testimony given on either side." Finally, it is telling that, after the mediator awarded damages to Tirreno, neither party availed themselves of arbitration's statutory mechanisms.[10] The Hartford filed a motion to enforce the settlement agreement, not an application to confirm the award; and Tirreno's counsel objected, claiming that she did not have the capacity to enter into a settlement agreement, but counsel did not file an application to vacate an arbitration award.

We conclude that trial court did not err when it refused to categorize the parties' chosen method of adjudication of their dispute as an arbitration proceeding and subsequently granted the motion to enforce the

settlement agreement. There was not a clear and direct manifestation, among their words, writings, or actions that indicated that the parties intended to adjudicate their dispute through arbitration. See *Harry Skolnick & Sons* v. *Heyman*, supra, 7 Conn. App. 179. The parties' agreement was to mediate and then, if they could not agree, to be bound by the mediator's figure. Our arbitration statutes may not be used as a sword to subvert a mutually agreed upon adjudication procedure or as a weapon of further court litigation.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Tirreno originally commenced this action by naming "The Hartford" as the defendant. Subsequently, the court granted the plaintiff's motion to cite in as defendants The Hartford Financial Services Group, Inc., which she asserted was doing business as The Hartford, and Trumbull Insurance Company.

[2] Tirreno raises two issues on appeal that were not raised at any stage in the trial court. First, she claims that any agreement between the parties was nonbinding, and second, "the mediator [failed] to consider pertinent evidence regarding her lack of capacity." Because Tirreno did not raise either of these issues before the trial court, we decline to consider them now. See *J. Wm. Foley, Inc.* v. *United Illuminating Co.*, 158 Conn. App. 27, 46–47 n.13, 118 A.3d 573 (2015) ("[t]o review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge" [internal quotation marks omitted]).

[3] Under oath, Tirreno's counsel, Jonathan Perkins, summarized the substance of the e-mails between himself and The Hartford's counsel, Daniel Scapellati: "You'd indicated that you wanted to have an agreement, that if the agreement could not be reached based on the mediation that the mediator would be asked to put a number on the case and both sides would agree to live with that." Later in the hearing, Scapellati asked Perkins about an e-mail in which he had asked Perkins to confirm that both sides would be bound by the mediator's decision:

"[Scapellati]: [I]n response to my e-mail that I sent to you on the day before mediation saying I want to make sure we're both on the same page—

"[Perkins]: I said agreed.

"[Scapellati]: You said you were in agreement; correct?

"[Perkins]: Correct."

[4] During testimony, Dr. Lowe defined "decisional capacity" as "the ability to understand the problem, the risk [or] the benefits. . . . And then it's the ability to actually make the decision."

[5] Tirreno does not challenge the trial court's legal conclusion that the settlement agreement was summarily enforceable. "Agreements that end lawsuits are contracts, sometimes enforceable in a subsequent suit, but in many situations enforceable by entry of a judgment in the original suit. A court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings. . . . When parties agree to settle a case, they are effectively contracting for the right to *avoid* a trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Audubon Parking Associates Ltd. Partnership* v. *Barclay & Stubbs, Inc.*, 225 Conn. 804, 811–12, 626 A.2d 729 (1993). "The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence. . . . To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. . . . In order for an enforceable contract to exist, the court must find that the parties' minds had truly met. . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them and the court will not make for them a contract which they themselves did not make." (Citation omitted; internal quotation marks omitted.) *Rosenblit* v. *Laschever*, 115 Conn. App. 282, 288, 972 A.2d 736 (2009).

During the December 10, 2013 hearing to enforce the settlement

agreement, Tirreno conceded that there was an agreement and it was binding:

"[The Plaintiff's Counsel]: There was an agreement.

"The Court: To enter into binding arbitration?

"[The Plaintiff's Counsel]: To enter into—well, it says mediation but—

"The Court: Binding mediation?

"[The Plaintiff's Counsel]: Yes."

On the basis of these admissions, the court's enforcement of the settlement agreement was legally and logically correct and supported by facts set out in the memorandum of decision. See *Kidder* v. *Read*, 150 Conn. App. 720, 733, 93 A.3d 599 (2014).

[6] In the e-mail Tirreno's prior counsel stated: "I will only be able to give you a final okay on 5/23 when I meet with my client . . . and will have her sign off on that approval."

[7] Undercutting her own argument, Tirreno's counsel argued before this court that an application to vacate the arbitration award was not filed in the trial court because: "If it wasn't an arbitration, there was no reason to do that."

[8] General Statutes § 52-408 provides in relevant part: "An agreement in any written contract, or in a separate writing executed by the parties to any written contract, to settle by arbitration any controversy thereafter arising out of such contract . . . or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit . . . shall be valid, irrevocable and enforceable, except when there exists sufficient cause at law or in equity for the avoidance of written contracts generally."

[9] We note that alternative dispute resolution methodologies are evolving and, thus, are not limited to standardized formats. The process here seems to comport with what legal commentators have labeled, mediation-arbitration or "med-arb." "Ordinary interest arbitration is normally a somewhat judicial procedure in which the neutral [arbitrator] takes evidence and then drafts the parties' agreement in the loneliness of his own study. In med-arb [however] the neutral [arbitrator] customarily works out solutions in the presence of and with input from the parties." (Internal quotation marks omitted.) *Glastonbury Education Assn.* v. *Freedom of Information Commission*, 234 Conn. 704, 716–17, 663 A.2d 349 (1995).

[10] For parties who agree to engage in an arbitration, the statutory benefits and protections of that process include: subpoena power, court ordered depositions, judicial advice on questions of law, notice requirements, and restrictions on appeals. General Statutes §§ 52-412, 52-415, 52-416 and 52-418.